UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
JONATHAN COHEN, SANDRA FABARA,
STEPHEN EBERT, LUIS LAMBOY, ESTEBAN
DEL VALLE, RODRIGO HENTER DE
REZENDE, DANIELLE MASTRION,
WILLIAM TRAMONTOZZI, JR., THOMAS
LUCERO, AKIKO MIYAKAMI, CHRISTIAN
CORTES, DUSTIN SPAGNOLA, ALICE
MIZRACHI, CARLOS GAME, JAMES
ROCCO, STEVEN LEW, and FRANCISCO
FERNANDEZ,

                Plaintiffs,             **MEMORANDUM**
                                         Case No. 13-CV-5612 (FB) (JMA)

    -against-

G&M REALTY L.P., 22-50 JACKSON
AVENUE OWNERS, L.P., 22-52 JACKSON
AVENUE, LLC, ACD CITIVIEW BUILDINGS,
LLC, and GERALD WOLKOFF,

                Defendants.
-----------------------------------------------------------x

*Appearances:*
*For the Plaintiffs*:                          *For the Defendants*:
JEANNINE LEIGH WIDMER CHANES, ESQ.    DAVID EBERT, ESQ.
Law Offices of Jeannine Chanes              MIOKO TAJIKA, ESQ.
27 Whitehall Street, 4th Floor                Ingram Yuzek Gainen Carroll &
New York, NY 10004                         Bertolotti, LLP
                                        250 Park Avenue, 6th Floor
                                        New York, NY 10177

**BLOCK, Senior District Judge**

        On November 12, 2013, the Court issued an order denying plaintiffs'

application for a preliminary injunction and stated that a written opinion would soon

1

follow.[1]  This is that opinion.

By issuing its order, the Court decided that the plaintiffs were not entitled to a preliminary injunction under the Visual Artists Rights Act of 1990 ("VARA"), 17 U.S.C. § 106A, to prevent the destruction of their paintings that adorned the exterior of the buildings owned by the defendants, which are scheduled for demolition.[2] The case has received wide media coverage because the buildings, located in Long Island City, had become the repository of the largest collection of exterior aerosol art (often also referred to as "graffiti art") in the United States, and had consequently become a significant tourist attraction—commonly known as 5 Pointz.

This marks the first occasion that a court has had to determine whether the work of an exterior aerosol artist—given its general ephemeral nature—is worthy of any protection under the law.

Plaintiffs invoke that part of VARA which gives the "author of a work of visual art" the right to sue to prevent the destruction of his or her work if it is one of

---

[1] The Court had previously issued a temporary restraining order that expired, after being extended for the permissible period of time, on that date. *See* FED. R. CIV. P. 65(b)(2) (limiting authority to extend TROs to a single extension of 14 days). And the Court could not grant another stay if the plaintiffs wished to appeal, since for all intents and purposes the standards for preserving the status quo pending appeal are identical to the preliminary injunction standards. *See Nken v. Holder*, 556 U.S. 418, 426 (2009).

[2] In the interim period between the denial of the preliminary injunction and the issuance of this opinion, a letter was filed on November 19, 2013, by plaintiffs' counsel notifying the Court that defendants, "under cover of darkness" had "painted over all of the works of visual art at 5Pointz" the prior evening. Letter from Pls.' Counsel (Nov. 19, 2013) (Dkt. No. 35).

"recognized stature."[3]  VARA recognizes that a work of visual art "may be incorporated in or made part of a building," and includes within its protective reach any such work that was created after its enactment on June 1, 1991, unless a written waiver was obtained from the artist.  *See* 17 U.S.C. § 113(d)(1).

Whether a protected work is of "recognized stature," is "best viewed as a gate-keeping mechanism." *Carter v. Helmsley-Spear, Inc.,* 861 F.Supp. 303, 315 (S.D.N.Y. 1994), *rev'd and vacated in part and aff'd in part, by* 71 F.3d. 77 (2d Cir. 1995).  Accordingly, since plaintiffs' works post-dated VARA and no written waivers were obtained, the Court held a preliminary injunction hearing on November 6-8, and ordered the parties "to be prepared to address, *inter alia,* whether each plaintiff's work was of "recognized stature."[4]

At the hearing, the Court heard testimony from three of the 17 plaintiffs, the

---

[3] The plaintiffs also argue that defendants have tortiously interfered with their prospective contractual relations and that plaintiff Jonathan Cohen has an easement in gross to use the buildings. The Court *sua sponte* dismisses them as meritless: There can be no tortious interference of prospective contractual relations unless, unlike here, defendants' conduct amounted "to a crime or an independent tort." *Carvel Corp. v. Noonan,* 3 N.Y.3d 182, 190 (N.Y. 1996); and there is no easement in gross since, also unlike here, there must a "writing containing plain and direct language evincing the grantor's intent to create a right in the nature of an easement rather than a revocable license." *State v. Johnson,* 45 A.D.3d 1016, 1018 (N.Y. App. Div. 2007). Even before a responsive pleading is filed, "[a] district court has inherent authority to dismiss meritless claims *sua sponte." Webster v. Penzetta,* 458 F. App'x. 23, 25 (2d Cir. 2012) (citing *Fitzgerald v. First E. Seventh St. Tenants Corp.* 221 F.3d 362, 363-64 (2d Cir. 2000)).

[4] The full order, issued on October 28, 2013, provided that the parties "be prepared to address, *inter alia*: (1) the individual artist and creation date for each current work for which protection under VARA is claimed; (2) whether each such work is of 'recognized stature' within the meaning of VARA; (3) the role played by plaintiff Jonathan Cohen in granting himself and the other plaintiffs permission to create works at 5Pointz, as well as his role in causing works to be whitewashed and/or painted over."

defendant Gerald Wolkoff, who is the principal owner of the defendants' real estate development companies, and purported expert witnesses from each side. The Court also received as evidence a number of exhibits, including 24 photographs of the plaintiffs' paintings—which until two days ago were on the walls of 5Pointz—that they claim were works of "recognized stature."  Several of the 24 works are reproduced in an appendix to this opinion.  Before exploring the evidence in order to make the requisite relevant findings of fact under FED. R. CIV. P. 65, it would be useful to first examine the principal aspects of VARA for an understanding of its purpose and reach in its grand design to protect the work of the visual artist.

## I

The Second Circuit's decision in *Carter* is the appropriate starting point.  In sum, the court explained that VARA amended existing copyright law to add protections for two "moral rights" of artists: the rights of *attribution* and *integrity*.  Moral rights are distinct from general copyrights, and they rest upon the "belief that an artist in the process of creation injects his spirit into the work and that the artist's personality, as well as the integrity of the work, should therefore be protected and preserved." *Carter,* 71 F.3d at 81. As noted by the circuit court in *Carter,* the right of attribution:

> generally consists of the right of an artist to be recognized by name as the author of his work or to publish anonymously or pseudonymously, the right to prevent the author's work from being attributed to someone else, and to prevent the use of the author's name on works created by others, including distorted editions of the author's original work.

*Id.*  The right of integrity "allows the author to prevent any deforming or mutilating

changes to his work, even after title in the work has been transferred." *Id.* And "[i]n some [international] jurisdictions the integrity right also protects artwork from destruction." *Id.* By enacting VARA, Congress made the latter a federal right. Thus, whether viewed as a subset of the right of integrity, *see* 17 U.S.C. § 106A(a)(3), or, as conceptualized by the circuit court in *Carter,* as a separate right, VARA protects against the destruction of works of visual art, but only if they are works of "recognized stature." 71 F.3d at 83 ("With numerous exceptions, VARA grants three rights: the right of attribution, the right of integrity and, in the case of works of visual art of 'recognized stature' the right to prevent destruction.").

      The Second Circuit in *Carter* noted that VARA carved out a number of exceptions. For example, it observed that a "work of visual art" is defined by the Act "in terms both positive (what it is) and negative (what it is not)." *Id.* at 83-84. Thus, the definition includes "'a painting, drawing, print, or sculpture, existing in a single copy' or in a limited edition of 200 copies or fewer,'" but excludes "'any poster, map, globe, chart, technical drawing, diagram, model, applied art, motion picture or other audio-visual work.'" *Id.* at 84 (quoting 17 U.S.C. § 101). Therefore, as explained in *Carter*, "Congress meant to distinguish works of visual art from other media, such as audio-visual works and motion pictures, due to the different circumstances surrounding how works of each genre are created and disseminated." *Id.* Although "this concern led to a narrow definition of works of visual art," *id.*, the Second Circuit adopted the language of the House Report that:

> [t]he courts should use common sense and generally accepted standards of the artistic community in determining whether a particular work falls within the scope of the definition. Artists may

> work in a variety of media, and use any number of materials in creating their work.  Therefore, whether a particular work falls within the definition should not depend on the medium or materials used.

*Id.* (quoting H.R. REP. NO. 514, at 11).

The circuit court also noted that for all covered works "the rights provided for endure for the life of the author or, in the case of a joint work, the life of the last surviving author," and, while they cannot be transferred, they "may be waived by a writing signed by the author."  *Id.* at 83.  Moreover, copyright registration is not required to bring a VARA infringement action, "or to secure statutory damages and attorney's fees."  *Id.*  In that regard, "[a]ll remedies available under copyright law, other than criminal remedies, are available."  *Id.*

What the Second Circuit did not do in *Carter* was to address what constitutes a work of "recognized stature," since, unlike the district court, it found that the particular work—a very large "walk-through sculpture," installed in the lobby of a commercial building—was "a work made for hire," meaning "a work prepared by an employee within the scope of his or her employment."  *Id.* at 85.  As such, it was one of the proscribed exceptions to VARA, requiring reversal for that particular reason.  The circuit court had no occasion, therefore, to determine whether the sculpture was of "recognized stature."  By contrast, after having held that the work was not covered by the "work made for hire" exception, the district court did indeed conclude that the work was of "recognized stature."  Its decision, therefore, marked the first time subsequent to the enactment of VARA that a court attempted to give some content and meaning to the phrase—which is not defined in the statute.

6

The lower court in *Carter* perceived "recognized stature" to implicitly require the plaintiff to make a two-tiered showing: "(1) that the visual art in question has 'stature,' i.e. is viewed as meritorious, and (2) that this stature is 'recognized' by art experts, other members of the artistic community, or by some cross-section of society." 861 F. Supp. at 325. In this latter regard, the court noted that an earlier version of VARA provided that a "court or other trier of facts may take into account the opinion of artists, art dealers, collectors of fine art, and other persons involved with the creation, appreciation, history, or marketing of works of recognized sources." *Id.* at 325 n.10 (citations omitted). Although it believed that this provision was eliminated from VARA prior to enactment to provide courts "greater discretion with regard to what sources may be considered in determining whether a given work of visual art is a work of recognized stature," it nonetheless thought that a court "can, and should, consider these sources." *Id.*

The district court concluded that the plaintiffs' experts had established that the sculpture in the lobby was a work of "recognized stature" principally because (1) one of the experts, an art critic and professor of art history, testified that "this was [a] coherent ongoing program," he wanted "everyone to go and see it," the sculpture was "a work of art like almost nothing I've ever seen before," and that it "is an incredible phenomenon and I want to see it again and learn more about it;" (2) another expert, the president of the Municipal Art Society of New York, testified that the Society had organized a tour of the work and was anxious to make the work a permanent part of its tour schedule; (3) a third witness, a professor who taught two- and three-dimensional design, testified that he was "very exhilarated" by the work, "[t]he imagination of the work is tremendous," and it is

"overall a very exciting piece." *Id.* at 325-26.  He enumerated the standards, which unfortunately are not identified in the court's decision, that he used to judge whether a given work is a work of recognized stature.

Although the two-tier *Carter* test has been referenced in a handful of subsequent cases, the Court's research has located only one circuit court and two other district courts that have substantively evaluated whether a visual art work was one of "recognized stature."[5]  In *Martin v. City of Indianapolis*, 192 F.3d 608 (7th Cir. 1999), the Seventh Circuit affirmed the district court's grant of summary judgment and its award of damages for a sculpture that had been destroyed.  It noted, however, that as plaintiff contended, "the *Carter v. Helmsley-Spear* test may be more rigorous than Congress intended." *Id.* at 612.  But the court did not have to address the issue since it accepted as probative evidence of "stature," under the more vigorous *Carter* test utilized by the district court—in the face of defendant's hearsay objections—"certain newspaper and magazine articles, including a letter from an art gallery director and a letter to the editor of *The Indianapolis News*, all in support of the sculpture." *Id.*  The circuit court also referenced a letter from the Director of Indiana University's Herron School of Art, who opined that the

---

[5]As examples of cases that have invoked the two-tier *Carter* standard but have not factually explored whether a work of visual art was of recognized stature, see *Hunter v. Squirrel Hill Assoc's.*, 413 F. Supp. 517 (E.D. Pa. 2005) (dismissing complaint on statute of limitations grounds but recognizing that complaint properly alleged a VARA claim under the *Carter* test); *Phillips v. Pembroke Real Estate, Inc.*, 288 F. Supp. 2d 89 (D.Mass. 2003) (granting an injunction under a moral rights state law, and declaring that a park as a whole is not a work of visual art entitled to VARA protection); *English v. BFC&R East 11th Street LLC*, 1997 WL 746444 (S.D.N.Y. 1997) ("VARA is inapplicable" to illegally placed graffiti); *Pavia v. 1120 Ave. of the Americas Assoc.*, 901 F. Supp. 620 (S.D.N.Y. 1995) (finding the VARA claims time-barred).

sculpture was "an interesting and aesthetic stimulating configuration of forms and structures," and an article by the visual arts editor of the *The Indianapolis News* describing the sculpture as "[g]leaming, clean and abstract, yet domestic in scale and reference," which "unites the area, providing a nexus, a marker, a designation, an identity and, presumably, a point of pride." *Id.* at 613.

In *Pollara v. Seymour*, 206 F. Supp. 2d 333 (N.D.N.Y. 2002), Judge Hurd held, as a matter of law, after a bench trial, that even under the *Carter* formulation, the particular mural in that case was not of recognized stature because "while plaintiff's work was unquestionably meritorious," it was "intended solely as a display piece for a one-time event." *Id.* at 336. The court reasoned, therefore, that "[i]t defies the underlying purpose of VARA to assume that the statute was intended to protect works of artistic merit *without regard* to whether such works were ever intended as 'art' or whether they were intended to be displayed as art or were otherwise intended to be preserved for posterity as works of artistic merit." *Id.* And in *Scott v. Dixon,* 309 F. Supp. 2d 395 (E.D.N.Y. 2004), the court dismissed plaintiff's VARA suit on the merits after a bench trial because the artist's sculpture had been commissioned for placement in the defendants' private backyard, which was obscured by hedges from public view. The court reasoned, therefore, that under VARA "it is not enough that works of art authored by the plaintiff, other than the work sought to be protected, have achieved [recognized] stature. Instead, it is the artwork that is the subject of the litigation that must have acquired this stature." *Id.* at 406. Thus, "while the Sculpture may have had artistic merit, it was not a work of recognized stature within the meaning of VARA" since it had never been exposed to the public. *Id.*

9

## II

The  evidence adduced at the preliminary injunction hearing in the present case reflects the following:

### A.  The Advent of 5Pointz

There is little disagreement about the origins of the aerosol art that adorned the defendants' buildings.  Plaintiff Cohen and defendant Wolkoff — the effective owner of the several buildings comprising 5Pointz — collectively explained that the buildings — one of which is five stories high — had for many years housed various commercial businesses. Starting in the early or mid-1990s, the exterior walls had become a place for distasteful graffiti by many self-proclaimed aerosol artists; it was then known as the Phun Phactory. To control this festering problem, Cohen approached Wolkoff in 2002 to become the curator of the works that would be permitted to be painted on the walls.  Wolkoff agreed; Cohen, known in the art world as "Meres One," was one of the principal contributors to the aerosol wall paintings and Wolkoff liked his work.  Wolkoff "was supportive of creative efforts but wanted somebody responsible to manage it."  Tr. at 21, Nov. 6, 2013.[6]  But nothing was put in writing; it was just the "general understanding that [Cohen] would be allowed to select who would be permitted to paint on the walls." *Id*. at 22.  Wolkoff, therefore, gave his oral blessings to permit qualified aerosol artists, under Cohen's control, to display their works on his buildings.

Soon the quality of the aerosol art vastly improved.  The site became known

---

[6]Citations to Tr. refer to the transcripts of the hearing.

as 5Pointz and evolved into a mecca for high-end works by internationally recognized aerosol artists.  As Cohen described it:

> In the time that I've been there, I've seen 5 to 10 artists on a very good day, until now up to 40 artists on a good day, and on our most craft [sic] day, a hundred ten artists painting. We have now 6 to 10 tour buses that come a day. There [are] foot tours, bike tours. Everyone wants to come and shoot a video there, and people come take engagement, wedding photos there. It's become a major attraction.

*Id.* at 27.

Cohen personally conducted hundreds of school tours a year, which sold out months in advance, for students from as far as Canada.  As he testified, there were also corporate and VIP tours; moreover, 5Pointz is listed in *Time Out New York* "as a New York must-see," and is in 150 tour guide books.

Marie Flageul, a professional event planner, lent further credence to the fact that 5Pointz had become a special public attraction.  For example, she put together a number of events there, including a performance by the famous DJ "Kool Herc" which attracted 4,000 people, and "a good amount of fashion, editorial photo shoots, happen at 5Pointz;" moreover, the last 12 minutes of a movie, "Now You See Me," featuring the stars Morgan Freeman, Jessie Eisenberg, Woody Harrelson, and Michael Caine, were shot at 5Pointz "because of the artwork." *Id*. at 139, 146.

Cohen best summed up 5Pointz in a magazine interview he gave in 2010:

> The 5 Pointz is a 200,000 square foot warehouse in Queens, New York, basically an entire city block. It was originially set up in 1993 as the Phun Phactory as a legit space thefor touists to come and drop pieces, but when it closed and fell in disrepair, I negotiated with the landlord to take the place over and reopened it as an outdoor exhibit space called the 5 Pointz – The Institute of Higher Burnin. 5 Pointz

11

represents the coming together of the 5 New York boroughs and until
a few months ago, we had about 90 resident artists who rented studio
space in the building[7] and we used the outside as a controlled canvas
for local and international artists to come, drop pieces and contribute
to the overall story. The building is 5 industrial stories high, and as
you can see, we pretty much managed to cover the whole exterior in
aerosol.

Pls.' Compl. Ex. A, *Interview, London Street-Art Design Magazine* (Feb. 16, 2010). There is little
question, therefore, that 5Pointz had become a recognized tourist attraction, and the
defendants do not contend otherwise.

 To his credit, Wolkoff acknowledged his appreciation of the works of art at
5Pointz—describing them as "beautiful." Tr. at 146, Nov. 7, 2013. Nonetheless, the time had
come to knock down the buildings to make room for two apartment complexes that are
expected to provide approximately 1,000 residences. In response to community pressure,
the City Planning Commission required, as a condition for the issuance of its building
permit, that defendants include 75 affordable housing units and install 3,300 square feet of
exterior art panels "to be used to maintain artist street wall art in the area." Wolkoff Aff. Ex.
H. Final building permit approval was issued on August 21, 2013. *Id*.

 When questioned by the court, Wolkoff testified that there was no feasible
engineering way he could preserve the existing buildings, with their "beautiful" art work,
and incorporate them into the new ones.

**B. "Recognized Stature"**

 When it came to whether any of the 24 works were of "recognized stature,"

---

 [7]Variously referred to as a building or buildings, 5Pointz is a set of warehouses
that once housed a water meter company.

much of the testimony did not differentiate between these discrete words, and by and large assumed that if the work had artistic merit it was *ipso facto* of recognized stature.  Thus, one of the plaintiffs, Danielle Mastrion, whose portrait of "Kool Herc" is among the 24, considered all of them to be of recognized stature because they satisfied factors such as "technical ability, composition, color, line work, detail and also the artist's credentials," Tr. at 20, Nov. 7, 2013; see the "Kool Herc" portrait at App. Ex. C.  And Joe Conzo, Jr., a documentary photographer, who described himself as one of the "forefathers" of the hip-hop culture reflected in the works at 5Points, essentially agreed, describing the works in general as "innovative" and "colorful," and in some cases, "pioneering." Tr. at 117, 119, 120, Nov. 6, 2013.  He believed that each of the 24 paintings was deserving of VARA protection because of the common elements of their "details" and "hard work." *Id.* at 123.

        Mastrion best expressed the notion that the artistic quality of the works alone qualified them as works of recognized stature in the following colloquy with the court:

> THE COURT: So just intrinsic quality of the work, even if it's not exposed to the public, would still qualify, in your opinion, as something that should satisfy the statutory standard of the status, so to speak?
>
> MASTRION: A beautiful piece of work, is a beautiful piece of work.
>
> THE COURT: So the fact that it's been exposed to the public, you don't think it necessarily is a factor or a consideration?
>
> MASTRION: I think it is. I think it elevates it even more.
>
> THE COURT: Even without that, it would still qualify?
>
> MASTRION: Yes.

Tr. at 60, Nov. 7, 2013.

This notion of the intrinsic quality of the work being the *sine qua non* for VARA protection was reinforced by Mastrion's testimony regarding the work of the artist Bernard Aptekar, currently gracing the courthouse's public gallery. Asked to opine on it, Mastrion believed that, although she did not know the artist, his works were certainly of recognized stature because she was "very blown away" by "the color work, the detail, the intricacies of them." *Id*. at 57.  Regardless of whether the work had achieved any other recognition, Mastrion believed that "[i]t would be a tragedy to see any of that work destroyed" because "[i]t's beautiful work down there." *Id.* at 58.

The focus of whether any of plaintiffs' 24 paintings were not only works of stature, but had also achieved the requisite recognition to bring them within the embrace of VARA, centered on the testimony of each party's proffered art expert.  The defendants' expert, Erin Thompson, an art history professor of impeccable academic credentials, took a restrictive view of both the concept of "stature" and "recognition."  In her opinion, while "quality is certainly one of the factors in the stature" of a work of art, "stature is recognizing not particular qualities of objects, but the way these qualities are valued by the public." *Id.* at 100.  And while she recognized that being "innovative" and possessing "uniqueness" are additional factors bearing upon a work's stature, ultimately to qualify as such a work, it should be at a level where scholars agree that it is "changing the history of art." *Id*. at 104.

As for the concept of "recognition," Professor Thompson's inquiry focused on ascertaining whether any of 24 works had been mentioned in academic publications or on the Internet.  She found that for 19 of the 24, "there were no dissertations, no journal articles, no other scholarly mentions of the work," and there were no Google results for either the

14

name of the work or the artist: "no one at all had seen fit to put on the Internet the name of

that work." *Id.* at 97.  Of the other five, three were mentioned "by the artists themselves or

on the 5Pointz web site," and "two of the remaining works each have one mention a piece

on a street art web site, on a blog, or an artist's blog." *Id.* at 99.  Although, in Thompson's

opinion, none of the 24 works was of recognized stature, she believed that Lady Pink's

work, "Green Mother Earth," came the closest because of all the artists, Lady Pink was the

only one who "had been mentioned in a dissertation, or a scholarly book or a journal

article." *Id.* at 98.  See App. Ex. A.

Although acknowledging that the art at 5Pointz had indeed achieved wide-

spread recognition as a tourist attraction, Professor Thompson believed that this would not

satisfy VARA recognition unless the visitors came "to see a particular work of art." *Id.* at

100.  If so, this would qualify as the requisite statutory recognition even in the absence of

any academic recognition.  As she acknowledged in response to the court's questioning:

> THE COURT: So am I correct in understanding that recognition . . . is
> somewhat an expansive concept? You can have academic recognition.
> You can have practical recognition by people flocking to see
> something.  Even if it's not in any book, it would all be under the
> umbrella of this concept of recognition, right?
>
> THOMPSON: Correct.

*Id.*

Thompson acknowledged that an aerosol artist's work, although a "sub-

culture" of the art world, could be of recognized stature if there were a "consensus of the

scholarly community and the art community," even if painted on the exterior of a building.

*Id.* at 102.  She gave as an example  the work of the internationally recognized aerosol artist

Banksy, who had been mentioned "in something like a hundred and thirty dissertations and more than 1500 scholarly articles," and whose recent work, completed on October 31, 2013, generated more than 400,000 Google results after only two weeks. *Id.*  And she also acknowledged, when asked by defendants' counsel if the fact that works at 5Pointz have been painted over would "affect your opinion whether the works [presently on the walls] have achieved recognized stature," that "[s]omething  can be ephemeral and achieve recognized stature." *Id.* at 107.

　　　　　Plaintiffs' expert, Daniel Simmons, Jr., the head of the Rush Philanthropic Arts Foundation and the owner of two well-known New York City art galleries, agreed with Thompson that aerosol art can achieve recognized stature and gave credible testimony as to both stature and recognition.  Simmons, a visual artist in his own right, has received many awards for his life-long commitment to art education.  He has also amassed a personal collection of mostly contemporary art which he valued at $5 million; it includes a number of Meres One's works.

　　　　　As for stature, Simmons' focus was, not surprisingly, also on the work's quality, such as "design, color, shape, form" and characteristics of "symmetry" and "innovation." Tr. at 18, 25, Nov. 8, 2013.  He believed that all 24 works qualified as "real artworks." *Id.* at 15.  Simmons heaped particular praise on Mastrion's portrait of "Kool Herc" as "absolutely fantastic" and instantly recognized "as a great piece of artwork," *id.* at 29, 33, as well as Meres One's works, and Lady Pink's "Green Mother Earth" mural.  See App. Ex. A, B, and C for each of these works.

　　　　　As for recognition, Simmons opined that it means "there's enough people that

know what [the work] looks like, and feels like and what it's trying to impart; that it would

be, to me, if it was missing from the canon of art history, that it would be a loss." *Id.* at 16.

He testified that if a work of art "was exhibited in galleries, and museums, and in places

where large number of people could see it, that would be recognized stature;" thus, "it

would have to be significant public exposure." *Id.* at 16-17.  When pressed by the Court to

elaborate on the concept of public exposure, Simmons invoked the works of all the artists

at 5Pointz:

> Well, recently, a few years ago the Brooklyn Museum had a big show
> on graffiti and acquired a lot of graffiti work into their collection, and
> a number of these artists that are on 5Pointz were in this exhibition in
> Brooklyn Museum.  I think that the number of people around the
> world that come to the location where this – what I've been calling
> way before this the '5Pointz Museum of Street Art' – makes any work
> that's up on that building [of] recognizable stature."

*Id.* at 17.

As for Lady Pink's "Green Mother Earth," Simmons classified it as "a great

example of her work"; moreover, one of her works was part of the show at the Brooklyn

Museum exhibit of great graffiti artists. *Id.* at 24.  He described the painting as "a great

example and a comparable example of the work that's been done since the '70s." *Id.*  In

particular, he thought its exposure at 5Pointz gave it great public recognition because "[i]t's

probably one of the pieces that people come to see because she is so recognized." *Id.* at 25.

Plaintiffs' counsel then focused Simmons' attention on a number of other

works included in the Appendix.  He opined that Meres One's "Drunken Bulbs" was of

recognized stature because the deployment of "these  light bulbs are iconic and seen and

known all over the world, "and that "[a]ny time you see this piece of work or this icon . . .

you know it's Meres One." *Id.* at 26; see App. Ex. B.  He testified that people came to see this work at 5Pointz "and anything that this artist does, because he is recognized.  So whatever works that he has on that building, he would be a draw to come to that building along with Lady Pink." *Id.* at 27.  Simmons heaped high praise on Meres One and Lady Pink by likening their works to a Picasso that was just "brought up from the basement," making their work "instantly famous because of the stature of the artist." *Id.* at 40.

As a specific example of Meres One's reputation, Simmons spoke about a documentary he made, *The Collage of Imagination*, in which he featured 5Pointz because it was "part of a movement." *Id.* at 28.  The film, which included an interview with Meres One, was televised nationally and also got 20,000 hits on YouTube.

Simmons had no knowledge of whether the 5Pointz artists or their works were the subject of any academic works, but he believed that "everything is in flux from the old ways of doing things, and the way things are publicized and the way the media looks at things." *Id.* at 30.  The thrust of his testimony regarding recognition for the 5Pointz artwork of Meres One, Lady Pink, and the other celebrated 5Pointz aerosol artists was that people are drawn to see their works because of the artists' reputations and the uniqueness of 5Pointz as an internationally recognized place to view the works at one location.

Simmons also praised "Manga Koi," a work by plaintiff Akiko Miyakami, also known as Shiro, which contains—like Meres One's light bulbs—an iconic figure "that's been seen all over the world." *Id.* at 34.  As he explained: "This artist is a world-renowned artist, and this figure has itself, not this particular painting, but this figure, which is incorporated in this painting, has been seen by hundreds of thousands of people around the world." *Id.*

18

And another work, "Dream of Oil" by Francisco Fernandez, was "probably seen more than any other piece" because of its size and location on top of one of the 5Pointz buildings where it had to be viewed every day by people riding the 7 train, making its visibility "tremendous." *Id.* at 37.  See App. Ex. D and E for "Manga Koi" and "Dream of Oil."

At the end of his testimony, when asked by plaintiffs' counsel "what impact would the loss of the works of visual [art] have on the art world and Hip Hop community," Simmons responded: "I think New York City as a whole would be diminished.  It's a major tourist attraction for Long Island City.  Its part of the development of Long Island City.  Just like, pretty much . . . MoMa being there, it's a drawing point for artists and art lovers to come from all over the world to see." *Id.* at 46.

In Simmons' opinion, 5Pointz and its extraordinary aerosol art had become "[p]art of the urban landscape," and "should be preserved, if possible." *Id.*

## C.  The Works' Duration

Wolkoff was emphatic that he told Cohen when he agreed in 2002 to let him control the work, that he was "going to be knocking down the building," and "it was always temporary." Tr. 144, 146, Nov. 7, 2013.  It was  certainly known by the 5Pointz world during the public hearings before the City agencies in the first part of 2013 that Wolkoff was seeking the requisite building permit, and that the buildings were destined for demolition, because "Marie [Flageul] came down and some of the others that might be sitting [in the courtroom] came down to object to me taking down 5Pointz." *Id.* at 153.

Cohen testified that when Wolkoff put him in charge "there was no discussion of any life span, and at the time [Cohen] really didn't have any long-lived expectations." Tr.

at 22, Nov. 6, 2013.  However, "[e]very year [he] heard the building was coming down." *Id.*
at 94.

Cohen explained at length about how he decided who would be allowed to
paint on the walls and where their works would be located.  Some of the walls were
"quickly rotating walls, which could last a day to a week;" they were purely "temporary,"
and meant to be turned over. *Id.* at 27, 29.  Others he deemed to be "permanent," meaning
that they would last "[a]s long as [he was] there and the operation's there." *Id.* at 29.  For
those, he chose special places—mostly high up.  It was all his decision.  And for a
"permanent" work, only the artist could thereafter decide whether it could be painted over.

The 24 works here at issue are the ones that were designated by Cohen to be
preserved.  *See id.* at 34.  Upon questioning, Cohen clarified that they were "scattered
around the building," and he therefore acknowledged that in order to preserve them the
"[m]ajority" of the whole building would have to be kept  in place "just to accommodate"
them." *Id.*

Cohen testified that in 2009 a staircase, which had collapsed, was removed
"and the whole building was painted over"—with the apparent singular exception of Lady
Pink's "Green Mother Earth," which Cohen "pretty much begged the workers not to go
over, because he "knew [he'd] never get her to do it over." *Id.* at 45.  Since then, as had been
the case in past years as well, Cohen confirmed that about "1,000 new images" had been
placed on the buildings each year. *Id.* at 46-7.  At the time of the preliminary injunction
hearing, there were about 350 that had survived; about 100 were Cohen's.

That Cohen and his fellow plaintiffs undoubtedly understood that  the nature

20

of the exterior aerosol art on Wolkoff's buildings was transient, and that all of the works that

he allowed to be painted on the buildings would last only until they would be demolished

to make room for Wolkoff's housing project, is further buttressed by the following telltale

evidence:

- In a Christian Science Monitor interview in 2007, subtitled *The Gatekeeper of New York's 'graffiti mecca,' 'Meres' decides who paints - and how long it stays,* Cohen is quoted saying: "Anyone can paint .  But not everyone's art stays up for long.  Some works last 12 hours; other pieces remain for two years."  Pls.' Compl. Ex. A., Interview of Jul. 24, 2007.

- In a March 2011 video interview, Cohen acknowledged that he knew all along about the plan to demolish the buildings:

  > Basically, the landlord (inaudible) been a factor that he might want to build real estate, and he recently had put an article in the *Daily News* stating that he is going to submit paperwork. I totally understand. I understand that's what the all along goal was.

  > It is a bit sad to see the building go due to the fact it touches so many hearts. But we know we have some time, and we plan on pretty much just concentrating on having a great season this year, and hopefully next year, and then we will see.

  > You know, whatever is kind of meant to be will be. We just want to continue to put out good work and have it so that the people that come here have a good time.

  Defs.' Prelim. Inj. Hr'g Ex. 1.

- On June 2, 2013, Marie Flaguel gave a radio interview acknowledging that back in 2010, a newspaper article reported that Mr. Wolkoff was talking about taking the building down. After that article, the "phone started ringing off the hook and people called, in 2010 and said, oh, the building is going down. This is how I found out, in 2010." Tr. at 156-57, Nov. 6, 2013.

- Danielle Mastrion painted her celebrated portrait of Kool Herc in

July 2013, even though she had "been hearing for years that there's always a chance that the building can come down," and was "aware that [the owners] were obtaining approval to knock down the building at the time [she] put the piece on the building." Tr. at 51, Nov. 7, 2013.

- Wolkoff received final approval from the City Planning Commission on August 21, 2013, for his housing project and permission to demolish the buildings. *See* Wolkoff Aff. Ex. H.

- All but six of the 24 works which plaintiffs claim are entitled to permanent protection under VARA were painted after 2010. Eight were painted this past September—including "Drunken Bulbs," "Dream of Oil," and "Manga Koi"—just weeks after the City Planning Commission approved the development plan. *See* Pls.' Schedule of Works submitted in response to the Court's Order of Oct. 28, 2013.

## III

The Court could not have issued a preliminary injunction unless the plaintiffs demonstrated "either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the [p]laintiff's favor." *Salinger v. Colting,* 806 F.3d 68, 79 (2d Cir. 2010) (internal citation omitted). If so, "the court may issue the injunction only if the plaintiff has demonstrated that he is likely to suffer irreparable harm in the absence of the injunction." *Id.* at 80 (internal citation omitted). In that regard, the Court "must actually consider the injury the plaintiff will suffer if he or she loses in the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *Id.* (internal citation omitted). Next, a Court "must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships

tips in the plaintiff's favor."[8]  *Id.*  Finally, the Court "must ensure that the public interest would not be disserved." *Id.*

Picasso believed that "[t]he purpose of art is washing the dust of daily life off our souls."  He surely would have supported applying VARA to protect the works of the modern aerosol artist.  As Congress recognized, whether a particular work falls within the definition of *visual art*, "should not depend on the medium or materials used," since "[a]rtists may work in a variety of media, and use any number of materials in creating their work." *See* H.R. REP. NO. 514 at 11 (quoted in *Carter*, 71 F.3d at 84).  This fits the aerosol artist to a "T," and our souls owe a debt of gratitude to the plaintiffs for having brought the dusty walls of defendants' buildings to life.

But VARA only protects a *work* of visual art. 17 U.S.C. § 106A; *see also* 17 U.S.C. § 202 ("ownership of a copyright, or any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied.").  The Court regrettably had no authority under VARA to preserve 5Pointz as a tourist site.  That authority is vested in state or local authorities, and since 5Pointz had become such a scenic

---

[8]This third step is obviously poorly conceptualized since the "balance of hardships" would have already been considered if a court had determined that there were "sufficiently serious questions going to the merits to make them a fair ground for litigation."  This inartful formulation can best be viewed as a rote borrowing of the standard applicable to permanent injunctions in light of the Supreme Court's decision in *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), requiring all traditional equitable standards to be evaluated even if it be determined that the plaintiffs established *actual success* at the permanent injunction stage of the litigation. Thus, for a preliminary injunction to issue, the "balancing of the hardships" is relevant regardless of whether plaintiffs have shown the "likelihood of success on the merits" or "sufficiently serious questions going to the merits."

attraction, the City probably could have exercised its power of eminent domain to acquire the site outright.  It chose not to. *Cf. Bunyan v. Commissioner of Palisades Interstate Park*, 153 N.Y.S. 622, 628 (3d Dep't. 1915) (affirming the purchase of a quarry for the purpose of preserving the "scenic beauty" of the Hudson River Palisades as a taking for "public use").[9] Although the Court was taken by the breadth and visual impact of 5Pointz, its authority under VARA is consequently limited to determining whether a particular *work* of visual art that was destroyed was one of "recognized stature," and if so, what monetary damages the creator of each work is entitled to.

        The evidence adduced at the preliminary injunction hearing leads the Court to conclude that at least some of the 24 works, which plaintiffs contend were of recognized stature, such as Lady Pink's "Green Mother Earth," present "sufficiently serious questions going to the merits to make them a fair ground for litigation." *Salinger,* 607 F.3d at 79.  The final resolution of whether any do indeed qualify as such works of art is best left for a fuller exploration of the merits after the case has been properly prepared for trial, rather than at the preliminary injunction stage.  Since VARA does not define "recognized stature," the court ultimately will have to decide whether to embrace the strictures of the academic views

---

        [9]Municipalities have additional means to protect sites such as 5Pointz.  Thus, the City could designate a site under its Landmark's Preservation Law.  *See* N.Y.C. Admin. Code § 25-302(n) (defining "landmark" as "[a]ny improvement [to real property],any part of which is thirty years old or older, which has a special character or special historical or aesthetic interest or value as part of the development, heritage or cultural characteristics of the city, state or nation").  This past August, the City's Landmarks Preservation Commission denied a request to designate the 5 Pointz site as a landmark because the feature of interest—the artwork—had not been in existence for at least thirty years. *See* Letter from NYC Landmarks Preservation Commission, August 20, 2013, Dkt. No. 031.

espoused by the defendants or the more expansive ones suggested by the plaintiffs. More testimony than that presented by the parties under the time constraints of the preliminary injunction hearing—where the pressures upon the parties and the Court circumscribed a full presentation and deliberation of this gate-keeping issue—will undoubtedly aid the Court in making its final decision.

The Court had to determine, therefore, whether the plaintiffs demonstrated that they were likely to suffer irreparable harm. Once again, as the circuit court in *Salinger* explained, this required the district court to consider "the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the remedies available at law, such as monetary damages, are inadequate to compensate for that injury." 607 F.3d at 80 (internal citation omitted).

Although the works have now been destroyed—and the Court wished it had the power to preserve them—plaintiffs would be hard-pressed to contend that no amount of money would compensate them for their paintings; and VARA—which makes no distinction between temporary and permanent works of visual art—provides that significant monetary damages may be awarded for their wrongful destruction. *See* 17 U.S.C. §§ 501-505 (providing remedies for VARA violations). In any event, paintings generally are meant to be sold. Their value is invariably reflected in the money they command in the marketplace. Here, the works were painted for free, but surely the plaintiffs would gladly have accepted money from the defendants to acquire their works, albeit on a wall rather than on a canvas.

Moreover, plaintiffs' works can live on in other media. The 24 works have

25

been photographed, and the court, during the hearing, exhorted the plaintiffs to photograph all those which they might wish to preserve.  All would be protected under traditional copyright law, *see* 17 U.S.C. § 106 (giving, *inter alia*, copyright owners of visual works of art the exclusive rights to reproduce their works, to prepare derivative works, and to sell and publicly display the works), and could be marketed to the general public—even to those who had never been to 5Pointz.

   Finally, whether viewed as bearing upon the issue of irreparable harm or the balancing of the hardships, the ineluctable factor which precludes either preliminary or permanent injunctive relief was the transient nature of the plaintiffs' works.  Regardless of Cohen's belief that the 24 works were to be permanently displayed on the buildings, he always knew that the buildings were coming down—and that his paintings, as well as the others which he allowed to be placed on the walls, would be destroyed.  Particularly disturbing is that many of the paintings were created as recently as this past September, just weeks after the City Planning Commission gave final approval to the defendants' building plans.  In a very real sense, plaintiffs' have created their own hardships.

   But this does not mean that defendants do not share some responsibility. After all, Wolkoff gave his blessings to Cohen and the aerosol artists to decorate the buildings, and he did not choose to protect himself from liability by requiring VARA waivers.  Moreover, while he was supportive of the artists and appreciated their work, he also stood to benefit economically from all the attention that had been drawn to the site as he planned to market the new buildings' residences.  Since, as defendants' expert correctly acknowledged, VARA protects even temporary works from destruction, defendants are

26

exposed to potentially significant monetary damages if it is ultimately determined after trial that the plaintiffs' works were of "recognized stature."

As for the public, its general interests will be served by the new apartments, including the 75 affordable housing units, and while the present walls will no longer exist, the public's aesthetic interests were addressed by the City Planning Commission by requiring 3,300 square feet of the exterior of the new buildings to be made available for art. Defendants can do even more. They can make much more space available, and give written permission to Cohen to continue to be the curator so that he may establish a large, permanent home for quality work by him and his acclaimed aerosol artists. For sure, the Court would look kindly on such largesse when it might be required to consider the issue of monetary damages; and 5Pointz, as reincarnated, would live.

　/S/ Frederic Block　
FREDERIC BLOCK
Senior United States District Judge

November 20, 2013
Brooklyn, New York