UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
JONATHAN COHEN, SANDRA FABARA,                  :   Case No. 13-CV-5612 (FB)(JMA)
LUIS LAMBOY, ESTEBAN DEL VALLE,                 :
RODRIGO HENTER DE REZENDE, WILLIAM              :
TRAMONTOZOZZI, JR., THOMAS LUCERO,              :
AKIKO MIYAKAMI, CHRISTIAN CORTES,               :
CARLOS GAME, JAMES ROCCO, STEVEN LEW,           :   **PLAINTIFFS' SUMMATION**
FRANCISCO FERNANDEZ and NICHOLAI KHAN,          :   **MEMORANDUM**
                                                :
                        Plaintiffs,             :
                                                :
        -against-                               :
                                                :
G&M REALTY L.P., 22-50 JACKSON AVENUE           :
OWNERS, L.P., 22-52 JACKSON AVENUE LLC,         :
ACD CITIVIEW BUILDINGS, LLC and GERALD          :
WOLKOFF,                                        :
                                                :
                        Defendants.             :
-----------------------------------------------------------------------X

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
MARIA CASTILLO, JAMES COCHRAN                   :   Case No. 15-3230
KENJI TAKABAYASHI, LUIS GOMEZ,                  :
BIENBENIDO GUERRA, RICHARD MILLER,              :
KAI NIEDERHAUSEN, CARLO NIEVA                   :
and RODNEY RODRIGUEZ,                           :
                                                :
                        Plaintiffs,             :
                                                :
        -against-                               :
                                                :
G&M REALTY L.P., 22-50 JACKSON AVENUE           :
OWNERS, L.P., 22-52 JACKSON AVENUE LLC,         :
ACD CITIVIEW BUILDINGS, LLC and GERALD          :
WOLKOFF,                                        :
                                                :
                        Defendants.             :
-----------------------------------------------------------------------X

**TABLE OF CONTENTS**

I.    Background……………………………………………………………………..1

II.   The Law Governing Escalation of Statutory Damages Supports
      a Significant Award to Each of the Plaintiffs…………………………………………..1

III.  The Evidence Supports a Finding of Liability as to All 49 Works of Art…………………..2

      A.  General Evidence Applicable to all 49 Works of Art……………………………………2

      B.  Specific Evidence to Consider Work by Work…………………………………....4

            The Individual Works…………………………………………………......5

            Carlos Game…………………………………………………………5

            1.  Black and White 5Pointz Girl…………………………………………...5
            2.  Red……………………………………………………………….6
            3.  Denim Girl……………………………………………………….6
            4.  Faces on Hut…………………………………………………….....6
            5.  Geisha……………………………………………………………6
            6.  Marilyn…………………………………………………………....7

            Kenji Takabayashi…………………………………………………..7

            7.  Starry Night………………………………………………………..7

            Richard Miller……………………………………………………8

            8.  Monsters I……………………………………………………….....8
            9.  Monsters II……………………………………………………….8

            Jonathan Cohen………………………………………………………9

            10. 7 Angle Time Lapse………………………………………………...10
            11. Clown with Bulbs……………………………………………………...10
            12. Patience…………………………………………………………...10
            13. Drunken Bulbs…………………………………………………….10
            14. Character……………………………………………………….11
            15. Meres Outdoor Wildstyle……………………………………………11
            16. Eleanor RIP………………………………………………………..11
            17. Inside Wildstyle…………………………………………………...12

<u>TABLE OF CONTENTS</u> (continued)

<u>Luis Lamboy</u>………………………………………………………………………12

18. Blue Jay Wall…………………………………………………………12
19. Inside 4th Floor………………………………………………………...13
20. Logo for Clothing Brand………………………………………………13
21. World Traveler………………………………………………………...13
22. Electric Fish…………………………………………………………...13

<u>Akiko Miyakami</u>…………………………………………………………...13

23. Japanese Irish Girl…………………………………………………14
24. Manga Koi……………………………………………………………14

<u>Christian Cortes</u>……………………………………………………………14

25. Up High Blue Skulls………………………………………………15
26. Skulls Cluster………………………………………………………15
27. Up High Orange Skulls………………………………………………15
28. Jackson Avenue Skulls……………………………………………....16

<u>James Rocco</u>………………………………………………………………16

29. Face on Jackson……………………………………………………16
30. Bull Face……………………………………………………………17
31. Lord Paz……………………………………………………………17

<u>Thomas Lucero</u>……………………………………………………………17

32. Black Creature………………………………………………………18

<u>Esteban Del Valle</u>…………………………………………………………18

33. Beauty and the Beast………………………………………………18

<u>James Cochran</u>……………………………………………………………19

34. Subway Rider………………………………………………………19

<u>Sandra Fabara</u>……………………………………………………………19

35. Green Mother Earth…………………………………………………20

<u>Nicholai Khan</u>……………………………………………………………20

36. Dos Equis Man……………………………………………………21
37. Orange Clockwork…………………………………………………...21

TABLE OF CONTENTS (continued)

Steven Lew……………………………………………………………………………21

38. Crazy Monsters………………………………………………………………22

Rodrigo Henter de Rezende……………………………………………………....22

39. Fighting Tree……………………………………………………………………23

Francisco Fernandez……………………………………………………………..23

40. Dream of Oil…………………………………………………………………23

Luis Gomez………………………………………………………………………24

41. Inside King Kong………………………………………………………………24

The Collaborative Works……………………………………………………………24

42. Japanese Fantasy……………………………………………………………..24
43. Halloween Pumpkins………………………………………………………25
44. Angry Orchard…………………………………………………………………25

William Tramontozzi……………………………………………………………26

45. Jimi Hendrix Tribute……………………………………………………………26

Bienbenido Guerra and Carlo Nieva…………………………………………..27

46. Return of New York……………………………………………………………27
47. Underwater Fantasy……………………………………………………………28
48. Save 5Pointz……………………………………………………………………28

Maria Castillo……………………………………………………………………29

49. Love Warrior and Burner……………………………………………………29

IV.   The Evidence Supports a Significant Award of both Statutory and
Actual Damages as to All 49 Works of Art………………………………………30

A.   A Significant Award of Statutory Damages Should be Made…………………………30

1.   The Policy Underlying Statutory Damage Awards is Important……………………30

2.   The Defendants' Conduct was Willful……………………………………………..31

3.  The Elements of Statutory Damages Strongly Support a
    Significant Award……………………………………………………………….31

    a.  The Deterrent Effect on both Mr. Wolkoff and on Third Parties……………..32

    b.  Mr. Wolkoff's State of Mind when he Destroyed the Artwork………………32

    c.  The Profits Earned by Mr. Wolkoff…………………………………………33

    d.  The Revenue Lost by the Plaintiffs…………………………………………33

    e.  The Conduct and Attitude of the Parties……………………………………33

B.  The Plaintiffs' Appraisals Should be Awarded as Actual Damages…………………34

V.  Conclusion……………………………………………………………………………35

## <u>TABLE OF CASES</u>

*Bryant v. Media Right Productions, Inc.*,
    603 F.3d 135 (2d Cir. 2010)……………………………………………………...1

*Carter v. Helmsley-Spear, Inc.*,
    861 F. Supp. 303 (S.D.N.Y. 1994), *aff'd* 71 F.3d 77 (2d Cir. 1995)………………………1

*Cohen v. G&M Realty L.P.*,
    988 F. Supp. 2d 212 (E.D.N.Y. 2013)…………………………………………...........1

*King Records, Inc. v. Bennett*,
    438 F. Supp. 2d 812 (M.D. Tenn. 2006)……………………………………………...1

*Psihoyos v. John Wiley & Sons, Inc.*,
    748 F.3d 120 (2d Cir. 2014)……………………………………………………..1

*Reno-Tahoe Specialty, Inc. v. Mungchi, Inc.*,
    2014 U.S. Dist. LEXIS 177168 (D.NV. 2014)…………………………………..1-2

**Background**

This matter was tried before an advisory jury which announced its verdict on November 7, 2017, in open court. The Court then authorized the parties to submit written summations reviewing the issues the parties believe the Court should consider when rendering its final verdict.[1]  This Memorandum constitutes that summation on behalf of all plaintiffs.

**I.      The Law Governing Escalation of Statutory Damages Supports a Significant Award to Each of the Plaintiffs**

The applicable law governing this matter is laid out by the Court in its Charge to the jury, and is based on  *Carter v. Helmsley-Spear, Inc.*, 861 F. Supp. 303 (S.D.N.Y. 1994), *aff'd* 71 F.3d 77 (2d Cir. 1995) and *Cohen v. G&M Realty L.P.*, 988 F. Supp. 212 (E.D.N.Y. 2013). The only issue that requires discussion here is the standard for escalating statutory damages for a willful violation of VARA to the maximum $150,000 amount.  Courts hold that "when the infringement is willful, the statutory damages award may be designed to penalize the infringer and to deter future violations." *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 127 (2d Cir. 2014).[2]  In *Reno-Tahoe Specialty, Inc. v. Mungchi, Inc.*, 2014 U.S. Dist. LEXIS 177168, *25 (D.NV. 2014) the court explained the circumstances under which the maximum amount of statutory damages should be awarded.  Stating that "[s]tatutory damages serve to sanction and vindicate the statutory policy of discouraging infringement" and that "when infringement is willful, statutory damages should be

---

[1]To the extent the plaintiffs are ultimately the prevailing parties they request that the Court establish a schedule for the submission of their application for attorney fees pursuant to VARA.

[2]Thus, it makes sense for statutory damages awards addressed to willful conduct to be at least at the upper end of the allowable range for non-willful damages, if not well above it.  In *Psihoyos*, for example, the court upheld awards where "non-willful infringement of [one] photo, resulting in an award of $750 in damages, and willful infringement of [two additional] photos, resulting in an award of $30,000 and $100,000 in damages, respectively." The *Psihoyos* court held: "Although revenue lost is one factor to consider, we have not held that there must be a direct correlation between statutory damages and actual damages. To suggest otherwise is to ignore the various other factors a court may consider and the purposes of statutory damages in the willful infringement context." *Id. See generally Bryant v. Media Right Productions, Inc.*, 603 F.3d 135, 144 (2d Cir. 2010); *King Records, Inc. v. Bennett*, 438 F. Supp. 2d 812, 852–53 (M.D. Tenn. 2006); 17 U.S.C. §504.

designed to penalize the infringer and to deter future violations," the *Reno-Tahoe Specialty* court held the following facts justified a maximum $150,000 award:  (1) the fact that the defendant was "on notice" of the legal rights claimed by the plaintiffs before the infringement; (2) that fact that the violations by the defendants were repeated and pervasive; (3) the unreasonable positions taken by the defendants during the litigation, needlessly driving up its cost.[3]

## II.     The Evidence Supports a Finding of Liability as to All 49 Works of Art

The evidence admitted at trial supports a finding of liability as to each of the 49 works of art at issue in the case under both the "stature" and the "mutilation" prongs of the VARA statute.[4] Both general and specific evidence as to stature was presented, and as shown below either is sufficient of itself to support a finding of liability.

### A.     General Evidence Applicable to All Works of Art

Pursuant to the applicable case law, the testimony of Renee Vara and the Charge provided by the court to the jury, a work of art has "stature" under VARA if it has "merit" as judged by (1) an expert or (2) the artistic community or (3) a cross section of the general public. In addition to the specific facts adduced by each plaintiff and the expert witness regarding the "artistic merit" of the

---

[3]As shown below, all of these factors apply with equal force in this case.  (1) The defendants had already been sued under VARA when they undertook the whitewashing. (2) The defendants whitewashed hundreds of works of art over the space of multiple days, whitewashing some of the works more than once (*see, e.g.,* Cohen at 1488; Wolkoff at 43:10-12) in a repeated and pervasive manner. (3) The defendants took many unreasonable positions during the litigation including but not limited to (a) misrepresenting to the court their need and their ability to demolish their building quickly, (b) refusing to heed the court's advice about settlement and refusing to concede that a single one of the 49 works of art by extremely prominent artists had been mutilated or was as work of stature, (c) suggesting many times that the plaintiffs' mutilation claims were disingenuous and repeatedly implying to the jury that the plaintiffs were gold-diggers and opportunists, (d) suing Plaintiff Cohen under baseless theories of "abuse of process" for purposes of intimidation and necessitating a successful motion for summary judgment by Plaintiff Cohen, (e) improperly seeking to preclude the plaintiffs' mutilation claims, (f) seeking to have a lawyer offer legal testimony and opinions about artistic merit rather than an art practitioner giving art-based analysis, and (g) Mr. Wolkoff personally and repeatedly refusing to follow the Court's admonitions when testifying as a witness. Note:  Citations are to the trial transcript, by witness name, unless otherwise indicated.

[4]The only exception is a small group of the works, identified below, as to which the plaintiffs concede the evidence did not establish mutilation as the Court defined it since the works were either entirely obliterated by white paint or there is no available evidence as to the extent of the whitewashing.

works of art at issue in this case, which specific facts are discussed below, two general factors were also adduced regarding artistic merit.  Each of the general factors is sufficient independently, and certainly when considered together, without more, to support a finding of artistic merit.

First, each of the works was a special part[5] of the world-famous 5Pointz museum, known as the "mecca of graffiti," having been designated as a work of unusual merit requiring long-standing display by the curator, Jonathan Cohen. This was a significant factor that the plaintiffs' expert witness Renee Vara relied upon (*see, e.g.,* Vara at 1631, 1643) in coming to her conclusions regarding stature.  Plaintiff Cohen's designation of these works as exceptional, without more, is sufficient to support a finding of artistic merit for each of them since he represents the judgment of the artistic community.[6]  Plaintiff Cohen testified that he had singled out each of these pieces as being of "high standing" due to the "amazing skill set" each exemplified.  Cohen at 1508:2-1509:4. No evidence was introduced to challenge this testimony.  To the contrary, both Mr. Wolkoff and his attorneys acknowledged the beauty of the works of art at issue in this case and Plaintiff Cohen's achievements as curator.

---

[5]The significance of being at 5Pointz was established not only by the testimony of Ms. Vara, Ms. Littlejohn and Plaintiff Cohen but also by the testimony of Angelo Madrigale (Madrigale at 1203:11-21), an art auction professional upon whom Ms. Vara relied, and Lois Stavsky, a journalist specializing in street art. Ms. Vara also testified that she relied on other prominent scholars she consulted to verify the importance of 5Pointz as an artistic institution.  Finally, the evidence is clear (indeed, undisputed) that 5Pointz was a major tourist attraction with hundreds or even thousands of daily visitors and worldwide acclaim (*see, e.g.,* Cohen at 1431:8-9), and in addition 5Pointz was exposed to indirect viewing by thousands of people each day who rode the subway train directly past the site or passed it on the major roadway to which it is adjacent. This applied as well to the indoor works, where guided tours were given to celebrity figures among many others (*see, e.g.,* Cohen 1436:15-19).  *See also* media coverage of 5Pointz as a leading tourist attraction, *e.g.*, Cortes Exhibit Folio at 19; Cochran Exhibit Folio at 78; Khan Exhibit Folio at 8-9; Lew Exhibit Folio at 11-14. Books and college dissertations were written to document the profound significance of the site. Vara at 679-681.

[6]Plaintiff Cohen could have testified in detail as to his reasons for designating each work of art for the "permanent collection" at the 5Pointz "museum," and did not do so only for purposes of judicial economy because there was no dispute as to this issue. The defense did not attempt to challenge a single one of his designations on cross examination and did not call a single witness with anything like Plaintiff Cohen's level of accomplishment in street art to try to dispute his designations.

Second, each of the works was appraised by Elizabeth Littlejohn, a qualified expert witness who testified that she specifically considered the artistic merit of each piece as part of her appraisal and created a "markup" for works that had special merit. Only three works of art did not receive a markup for artistic merit from Ms. Littlejohn (*see* Plaintiffs' Exhibit 1269 reflecting Ms. Littlejohn's calculations).[7]  All were given a very substantial financial value.

Thus, without even reviewing the voluminous specific evidence set forth in the exhibit folios and the testimony of Renee Vara, both of which are discussed in detail below, there is more than enough evidence for the fact finder to conclude that each work of art at issue in this action had "artistic merit."

**B.      Specific Evidence to Consider Work by Work**

The specific evidence relating to liability as to each of the 49 works at issue is reviewed below. Both independently and when combined with the general evidence described above, this evidence is more than sufficient to establish each of the 49 works as having artistic merit. [8]

---

[7]These three were "RIP Eleanor" and "Character" by Jonathan Cohen and "Lord Paz" by James Rocco. Despite their not receiving a markup (which ranged from 0% to 10%) for special merit, each was appraised at a significant financial value.  Ms. Littlejohn testified that each of the works of art was significant enough to have a very high market value, measured in tens of thousands of dollars. Her estimation of the intrinsic financial value of the works was not disputed by the defense expert, who to the contrary effusively praised the quality of the artworks and merely opined that the works would not actually make their appraisals under the auctioneer's hammer because of the lack of provenance and the cost of removal and maintenance. This testimony by the defense expert relates only to damages, not liability, and for the reasons set forth below was without merit.

[8]We begin with the 41 individual works of art, organized by plaintiff artist, and then move to the eight collaborative works, and continuously number the works from one through 49 across these three subject groupings for convenience.   We review for each work of art the main (but not the only) evidence establishing, pursuant to the Court's Charge, that the artist was a person of achievement and recognition in his field, that the artwork was specifically recognized by a qualified expert witness, by the art community, and by a cross section of the general public, and that the whitewashing of the work did not completely obscure it from view such that it was "mutilated" and entitled to damages regardless of artistic merit. We do not specifically discuss liability for destruction of the artwork, since it was not disputed, nor do we specifically discuss the testimony of each artist, as set forth in the record, that the mutilation damaged his honor and reputation, since this damage speaks for itself and the testimony of each artist was similar in this regard.  The plaintiffs' works of art were whitewashed under cover of night using the cheapest paint the owner could find, and they were not fully erased by rather left to be seen in tatters. There was widespread news coverage of the whitewashing, and the whitewashing stood for many months for all to gape at before

## The Individual Works

Carlos Game

Ms. Vara testified that Plaintiff Game had been singled out for recognition by two noted scholars she consulted, Joseph Austin and Gregory Snyder (Vara at 1059:9-15; 1060:8-18) and has a substantial presence in social media (Vara at 1061:1-5; *see also* Game Folio Exhibit at 19, 43-46). He was featured in a gallery exhibition funded by the National Park Service and the National Endowment of for the Arts which was written up in an art publication, Game Folio Exhibit at 13, was hired by the Museum of Modern art to restore a major installation by the prominent German artist Katharina Grosse (Game at 807:2-7;  *see also* Game Folio Exhibit at 12), and worked on other major publicized projects such as one devoted to the 9-11 memorial which was written up in the prestigious art magazine *Complex* and a large installation in the "important art district" of Chelsea surrounding a building designed by world-famous architect Zaha Hadid.  He also had showings of art by private art galleries in both the U.S. and France (Game Folio Exhibit at 2, 15, 21; Cohen Folio Exhibit at 16-20, 28-29; Vara at 1641:9-15).  In addition to the general factors described above and his career factors, Plaintiff Game's individual work at issue in this case was recognized as follows.

1.  *Black and White 5Pointz Girl* **[Game Folio Exhibit at 40]**

 "Black and White 5Pointz Girl" was recognized by a cross section of the general public (Game Folio Exhibit at 45) and by expert testimony. (Vara at 1055).  "Black and White 5Pointz Girl" was mutilated. Game Folio Exhibit at 56-57.  The top portion of the woman's head and the 5Pointz star are not covered in white paint, and the artist's signature is in plain sight as well.

---

the building was finally demolished. Moreover, many of the works were "bombed" with illegal graffiti after being whitewashed, something that the whitewashing predictably encouraged (*see, e.g.,* Lew at 1366:20-1367:1).  A loud and clear message was sent by the owner to the world that the works of art at issue were worthless, disposable trash that could be treated with the ultimate disrespect.  For all these reasons, a very substantial award of actual damages for reputational harm should be made to each artist who is found to have qualified for such an award by proving mutilation occurred.

### 2.   *Red*  [Game Folio Exhibit at 37]

"Red" was recognized by Ms. Vara as a work of artistic merit because of the complex execution of the work in its architectural context (on multiple adjoining walls at different angles) to create an image that achieves "direct communication" with the viewer.  Vara at 1046.  "Red" was mutilated. Game Folio Exhibit at 52-53.  The mutilation is obvious for all to see, the thin layer of cheap white paint is entirely transparent and barely obscures the signed work at all.

### 3.   *Denim Girl*  [Game Folio Exhibit at 38]

"Denim Girl" received recognition from a cross section of the general public.  Game Folio Exhibit at 46. It was also recognized as a work of artistic merit by expert testimony.  Vara at 1046-1048.   "Denim Girl" was mutilated. Game Folio Exhibit at 54-55.  The outlines of the figures hair are visible beneath the paint, and insult was added to injury when the work was then "bombed" with illegal graffiti, a harsh insult to the artist.  Game at 815:9-816:4.

### 4.   *Faces on Hut* [Game Folio Exhibit at 39]

"Faces on Hut" was recognized by Ms. Vara as a work of artistic merit because it was a signature depiction of a celebrity with the "grisaille" black-and-white photorealistic technique with a "very, very high level of skill" especially when using aerosol paint.  Vara at 1054; Game at 794-795.  Plaintiff Game is not claiming that "Faces on Hut" was mutilated.

### 5.   *Geisha* [Game Folio Exhibit at 32]

"Geisha" was recognized by Ms. Vara as a work of artistic merit because it created a unique image of a geisha which could interact directly with viewers, contradicting stereotypes and creating volume and form in the depiction using painterly techniques. Vara at 1043. "Geisha" was mutilated. Game Folio Trial Exhibit at 48-49. The signature of the artist, applied in blue paint to the air conditioner vent, was not whitewashed, giving the false and embarrassing impression that the artist created the whitewashed image and not the "Geisha" image and then signed it.  *See* Game at

813:20-22.   Moreover, elements of the hair of the "Geisha" image on the upper portion of the wall were not whitewashed at all, nor were lower portions of the kimono.

>       **6.   *Marilyn* [Game Folio Exhibit at 34]**

 "Marilyn" was recognized by the art community via publication on the art blog "In the Wit of an Eye"  by Hans von Rittern, *see* Game Folio Exhibit at 36, and received recognition from a cross section of the public as well, *id.* at 44. Finally, it was recognized as a work of artistc merit by an expert witness.  Vara at 1045-1046. "Marilyn" was mutilated, more than once.  Game Folio Exhibit 50-51; Game at 814:19-23.  Feature of the face and the dark sweater are clearly visible and the work was subsequently "bombed" with illegal graffiti. Game at 814:7-23.

>       Kenji Takabayashi

Ms. Vara discussed the importance of Plaintiff Takabayashi's overall prominence as an artist in evaluating his work at 5Pointz. She noted his having a high-profile role in designing artwork for Major League Baseball (Takabayashi Folio Exhibit at 8; Vara at 656:22-657:6), as well as his history of experience at the High School of Art and Design working with other high-profile street artists, gallery exhibitions and press coverage. Takabayashi Folio Exhibit at 5, 8, 13, 15, 17; Vara at 656-657.   In addition to the general factors described above and his career factors, Plaintiff Takabayashi's individual work at issue in this case was recognized as follows.

>       **7.   *Starry Night* [Takabayashi Folio Exhibit at 21]**

 "Starry Night was recognized by the artistic community (Takabayashi Folio Exhibit at 25, 27; Vara at 663:17-25; 664:6-9; 692:9-18) and by a cross section of the general public Vara 665-666 (Takabayashi Folio Exhibit at 23, 29; Vara at 661:15-17; 666:15-667:1; 668:5-16). It was also recognized by expert testimony (Vara at 659-660). "Starry Night" was mutilated and the mutilation was publicized, the top portion being untouched by whitewashing and color palette being clearly

7

exposed elsewhere. Takabayashi Folio Exhibit at 31-32, 34.  The work was also subsequently "bombed" by illegal graffiti, as the whitewash image reveals.  Takabayashi at 314:4-7.

Richard Miller

Plaintiff Miller's substantial career accomplishments bolster the artistic merit of his artwork. He maintains his own website, was interviewed by leading community publications such as DoSavannah, Street Art NYC, Street Art Anarchy and Vandalog about his artwork and he maintains a significant following on social media, including both Facebook and Instagram as well as Twitter. Miller Folio Exhibit at 5, 7, 9, 11, 15, 17, 20, 22, 23, 25.  In addition to the general factors described above and his career factors, Plaintiff Miller's individual work at issue in this case was recognized as follows.

**8.    *Monsters I* [Miller Folio Exhibit at 28]**

Ms. Vara opined that "Monster I" was a work of artistic merit because it was a work that could be equally appreciated by adults and children and successfully created the experience of being transported into an imaginary world.  In addition, painted on two adjoining wall planes Ms. Vara explained that the work creates a dialogue between the two spaces, and she praised Plaintiff Miller for creating the same quality stencil effect achieved by artists like Banksy without actually using a stencil, a much higher degree of difficulty. Finally, she noted the color, form, humor and subject matter of artist as possessing unusual distinction. Vara at 1084.  Plaintiff Miller does not claim that "Monsters I" was mutilated.

**9.    *Monsters II* [Game Folio Exhibit at 30]**

 "Monsters II" was recognized by the artistic community (Vara at 1087-1088) and by a cross section of the general public (Miller Folio Exhibit at 34, 36, 38, 40; Vara at 1089) as well as by expert testimony.  Vara at 1083:22-1084:18; 1085:23-1086:16.  "Monsters II" was mutilated not by being partially covered in white paint but rather by being ripped it from its rooftop perch and

thrown it helter-skelter onto a demolition pile where it was photographed in a disheveled state and thus circulated across the Internet. Miller Folio Exhibit a 45.

Jonathan Cohen

In addition to his own stellar career as an artist, Plaintiff Cohen was the curator of the world's largest street art museum, an institution famous around the globe. He has appeared over 500 times in major media outlets ranging from the *New York Times* to the *Wall Street Journal* to the Today Show to ESPN to the TV show Project Runway (Vara at 1640-1641). He has been commissioned for a wide variety of high-profile work ranging from designing a Louis Vuitton showroom and a Deutsche Bank headquarters to dressing a music video by world famous recording artist Joss Stone to branding America's major league soccer to decorating a luxury hotel in Geneva, Switzerland to branding a bottle of French wine to directing a large installation in the "important art district" of Chelsea surrounding a building designed by world-famous architect Zaha Hadid (Cohen Exhibit Folio at 7, 8-10, 12, 14, 29, 56, 74, 78, 80).  He has been exhibited in museums and galleries across the United States (*id.* at 7) as well as in Europe (*id.* at 8) and been featured in fourteen significant documentaries (Vara at 1645:19-20).  His achievement as curator at 5Pointz is without peer in the history of street art, and indeed is extremely rare for any artist in any genre (Vara at 1642:14-16).  The *New York Times* called 5Pointz "a world class museum" (Cohen Exhibit Folio at 5) and multiple graduate theses have been written about his work (Vara at 1644-1645).[9]

_____

[9]Even if there were no other evidence of stature regarding the work by the other 20 plaintiff artists than that Plaintiff Cohen as curator designated those works to have artistic merit and to deserve preservation as part of his "permanent collection," a reasonable fact finder could rely on that fact alone to conclude that the works were protected by VARA (in a very real sense Plaintiff Cohen and the street art community are synonymous, at least where 5Pointz is concerned, and the defense expert who testified at trial was in many ways far less qualified than he is to opine about the artistic merit of works of street art than Plaintiff Cohen). As for the individual works Plaintiff Cohen himself installed at 5Pointz, he applied the same curatorial standards as any other work (Cohen at 1424:4-5).  *See also* Madrigale at 1209:24-25.

**10.**   *7 Angle Time Lapse* **[Cohen Folio Exhibit at 89]**

"7 Angle Time Lapse" was recognized by the artistic community (Cohen Folio Exhibit at 119, 128; Madrigale at 1209:21-24) and via expert testimony (Vara at 1649:12-14, 20-24; 1651:10-14). It was unprecedented in its ambition. Cohen at 1409:21-23.  "7 Angle Time Lapse" was mutilated (Cohen Folio Exhibit at 132-133).  Portions of the lamp and the 5Pointz star remained untouched by the whitewash, as did the blue background coloration and the entire floor area.

**11.**   *Clown With Bulbs* **[Cohen Folio Exhibit at 95]**

"Clown with Bulbs" had recognition from the artistic community (Cohen Exhibit Folio at 120) as well as being judge a work of artistic merit by an expert (Vara at 1651:25-1652:1).  "Clown with Bulbs" was mutilated (Cohen Exhibit Folio at 138-139).   The light bulb "balloons" and the clown face are both clearly visible behind the thin veneer of cheap white paint.

**12.**   *Patience* **[Cohen Folio Exhibit at 105]**

"Patience" was recognized by Ms. Vara as having artistic merit.  Vara at 1653: 10-12. Plaintiff Cohen confirmed it was an important work due to its high degree of difficulty and its unusual subject matter. Cohen 1430.  "Patience" was mutilated.  Cohen Exhibit Folio at 148-149. The entire image is fully visible behind the thin veneer of cheap white paint.

**13.**   *Drunken Bulbs* **[Cohen Folio Exhibit at 91]**

"Drunken Bulbs" was recognized by Ms. Vara as having artistic merit as an "iconic" expression of the artist's "signature style." Vara at 1651:17-18.[10]  Plaintiff Cohen described it as an important expression of his iconic style because it had an unusual level of detail and dimensionality.

---

[10] Ms. Vara could have provided additional detail regarding her opinion about Plaintiff Cohen's work but was limited in doing so by time constraints imposed due in part to the fact that Plaintiff Cohen had by far the largest group of works to be covered by her testimony. *See*, e.g., Vara at 1646:7-10; 1646:18-1647:5; 1648:15-25; 1651:15-16.  The Cohen Exhibit Folio documents the importance of the light bulb iconography produced by Plaintiff Cohen (*see* Cohen Exhibit Folio at 29, 35, 43-44, 72, 74) something he designed to "really stand out" from other artwork (Cohen at 1411:10-11) and which was requested by the market (*id*. at 1501:11-14, 21-25; 1502:14-19).

Cohen at 1418:22-1419:1.  "Drunken Bulbs" was mutilated (Cohen Folio Exhibit at 134-135).  The shapes of the bulbs are all visible behind the cheap white paint and recognizable as iconic images of the artist.

       14.    *Character* **[Cohen Folio Exhibit at 111]**

"Character" was recognized by Ms. Vara as having artistic merit as an evocation of French realist style as well as a monochromatic emphasis on line and form which she found "masterful." Vara at 1654:3-7.  Plaintiff Cohen explained that this type of figurative image was iconic in his career and that it had taken him decades to acquire the skill to execute a figure of this quality. Cohen at 1434.  Plaintiff Cohen does not claim that "Character" was mutilated.

       15.    *Meres Outdoor Wildstyle*[11] **[Cohen Folio Exhibit at 93]**

"Meres Outdoor Wildstyle" was recognized by Ms. Vara as having artistic merit as a demonstration of the artist's "accomplishment with the wildstyle language" conveying motion and dynamism.  Vara at 1651:20-23. Plaintiff Cohen testified that this was an important piece because of the difficult uneven surface and the high public visibility as well as his status as a world leader of this type of expression. Cohen at 1420-1421.  "Meres Outdoor Wildstyle" was mutilated (Cohen Folio Exhibit at 136-137).   The top portion of the work was totally exposed and the color palette is visible throughout.

       16.    *Eleanor RIP* **[Cohen Folio Exhibit at 103]**

"Eleanor RIP" was recognized by Ms. Vara as having artistic merit because the artist used extreme physical height to connect the memorial to the heavens and expressing a mastery of lettering.  Vara at 1653:3-7. Plaintiff Cohen confirmed it was an important piece due to its connection to his family. Cohen at 1428-1430.  Plaintiff Cohen does not claim that "Eleanor RIP" was mutilated.

---

[11]This work is referred to as "Meres Outdoor Burner" in the pleadings but as "Meres Outdoor Wildstyle" in the testimony and in the verdict sheet.

**17.**   *Inside Wildstyle*  **[Cohen Folio Exhibit at 113]**

"Inside Wildstyle" was recognized by Ms. Vara as having artistic merit particularly because of its being an important memorial to a well-known graffiti writer using classic graffiti style to evoke that artist's era.  Vara at 1654:10-14.  Like "Eleanor RIP" Plaintiff Cohen confirmed this was an important piece due to being a memorial to a significant graffiti artist, and accordingly it had bird and cloud features added to it.  Cohen at 1435-1436.  Plaintiff Cohen does not claim that "Inside Wildstyle" was mutilated.

<u>Luis Lamboy</u>

Plaintiff Lamboy has an extensive artistic career with a long litany of notable achievements including working for Sotheby's.  Lamboy at 854.  He has had international gallery shows in major cities such as London, Geneva (at a United Nations facility), Moscow and Amsterdam and gallery shows around the U.S. from Washington D.C., to Miami (including the prestigious Wynwood Art Walk).  He was written up in the *Courier Journal* newspaper, *DIVA* magazine and the art book *Name Tagging* and his work was featured on the TV show Project Runway All-Stars.  Lamboy Folio Exhibit at 5, 7, 8, 20, 30, 33, 40, 41-42.  He also designed footwear for Nike, Lamboy Folio Exhibit at 37, and had substantial social media followings.  *See also* Madrigale at 1210. In addition to the general factors described above and his career factors, Plaintiff Lamboy's individual work at issue in this case was recognized as follows.

**18.**   *Blue Jay Wall* **[Lamboy Folio Exhibit at 54]**

 "Blue Jay Wall" was recognized by the artistic community (Lamboy Folio Exhibit at 58, 35; Vara at 1074:23-1075:2), by the general public (Vara at 1075: 6-8, 15-17) and by expert testimony (Vara at 1068:22-1069:14).  "Blue Jay Wall" was mutilated.  Lamboy Folio Exhibit 74-75.  The blue coloration and the outlines of the wildstyle characters remain clearly visible beneath the white paint.

**19.** *Inside 4th Floor* **[Lamboy Folio Exhibit at 60]**

"Inside 4th Floor" was recognized by expert testimony for its "grounding in surrealism that echoes' Dali" and its combination of "creative expression" with "traditions of graffiti art."  Vara at 1070: 1-3; 7-9.  "Inside Wildstyle" was mutilated. Lamboy Exhibit Folio at 76-77.  The colors and shapes in red, orange, green and purple remain visible beneath the thin layer of cheap white paint.

**20.** *Logo for Clothing Brand* **[Lamboy Folio Exhibit at 64]**

"Logo for Clothing Brand" was recognized by expert testimony as a work of artistic merit for its use of "traditional old style retro lettering integrating an image from popular culture" and his differentiation of a logo from a work of art using "drips" so that the "handmade" texture of the work is emphasized.  Vara at 1071:17-22.  Plaintiff Lamboy is not claiming that "Logo for Clothing Brand" was mutilated.

**21.** *World Traveler* **[Lamboy Folio Exhibit at 62]**

"World Traveler" was recognized as having artistic merit via expert testimony since a visual inspection of this work lead Ms. Vara to praise the of its "exuberant" style of the work, Vara at 1070:22, and the integration of "pictorial forms" in the lettering, Vara at 1070:24-1071:1.  Plaintiff Lamboy is not claiming that "World Traveler" was mutilated.

**22.** *Electric Fish* **[Lamboy Folio Exhibit at 66]**

"Electric Fish" was recognized by expert testimony to have artistic merit because of the masterful way in which the artist integrated the presence of the window, the sensory impression of an aquarium and the *trompe l'oeil* visual effects, creating a "work of interest and quality."  Vara at 1072:6-13.  Plaintiff Lamboy is not claiming that "Electric Fish" was mutilated.

<u>Akiko Miyakami</u>

Ms. Vara identified Plaintiff Miyakami as such a significant artist that she had "brand power," citing 170 exhibitions (*see* Miyakami Exhibit Folio at 5-7, the artist's curriculum vitae), 16

murals (*see, e.g.*, *id.* at 9, 11, 13-14), 25 videos, 35 major press reports including the prestigious National Public Radio (*see, e.g., id.* at 16-17, 21-22, 24, 30, 68) and 40 additional artistic projects of various kinds, as well as recognition from important sources in academia (Miyakami Folio Exhibit at 28 and Vara at 1608:6-11; 1614:18-20; 1616:5-7) and social media (Miyakami Exhibit Folio at 44; Vara at 1617-1618). *See also* Vara at 1608:15-23; 1609:2-8. In addition to the general factors described above and her career factors, Plaintiff Miyakami's individual work at issue this case was recognized as follows.

### 23. *Japanese Irish Girl* [Miyakami Folio Exhibit at 38]

"Irish Girl" was recognized by the artistic community (Vara at 1616:8-11) and a cross section of the general public (Miyakami Exhibit Folio at 50; Vara at 1618:6-9) as well as by expert testimony (Vara at 1611:24-1612:16). "Irish Girl" was mutilated (Miyakami Folio Trial Exhibit at 61-62). Plaintiff Miyakami testified without contradiction at trial that the image of the "Fighting Irish" football team logo on the chest of the character was clearly visible through the whitewash. Miyakami at 1302:7-10.

### 24. *Manga Koi* [Miyakami Folio Exhibit at 40]

"Manga Koi" was recognized by the general public (Vara at 1618:24-1619:3) and by expert testimony (Vara at 1611:17-21; 1613:8-9). Plaintiff Miyakami is not claiming that "Manga Koi" was mutilated.

<u>Christian Cortes</u>

Plaintiff Cortes has highly advanced formal training in art that began in high school, Cortes Folio Exhibit at 5, and is employed as an Art Director working with major retailers like Target, Sears and Walmart. *Id.* His artwork has been featured in numerous street art publications, *id.* at 7, on CD music covers and in music videos, *id.* at 8, and he won the grand prize at the Heinekin Murals Contest held at the MOMA PS1 location, *id.* at 9. His work is so prominent that it was even

featured in a leading New York City travel guide, *id.* at 17-18, and he has been interviewed by various media outlets, *id.* at 14, 21, 23. He has a very substantial social media presence which highlights his work (Vara at 775:4-6).  In addition to the general factors described above and his career factors, Plaintiff Cortes's individual work at issue this case was recognized as follows.

**25.   *Up High Blue Skulls*[12] [Cortes Folio Exhibit at 40]**

 "Up High Blue Skulls" work was found by expert opinion to have artistic merit (Vara at 748-750) because it was characterized by craft, ability to draw and control of the aerosol application (Vara at 750:6-8).  Plaintiff Cortes is not claiming that "Up High Blue Skulls" was mutilated.

**26.   *Skulls Cluster* [Cortes Folio Exhibit at 36]**

"Skull Cluster" was recognized by the artistic community (Vara at 772:11-14) as well as expert testimony (Vara at 751:15-16).   "Skull Cluster" was mutilated.  Cortes Folio Trial Exhibit at 48-49.  The outlines of the skulls and particularly their teeth are clearly visible behind the white paint, something that is not surprising since the outlines were created in dark black colors that would be difficult to completely obscure with the inexpensive white paint used by the defendants. *See* Cortes at 565:1-4.

**27.   *Up High Orange Skulls* [Cortes Folio Exhibit at 42]**

 "Up High Orange Skulls" was recognized by the artistic community (Vara at 772:11-14; Vara 772:22-23, Cortes Folio Exhibit at 11, 15.  It was also recognized by expert testimony (Vara at 753).  "Up High Orange Skulls" was mutilated. Cortes Exhibit Folio at 54-55. The bright orange flame tones remained visible at the top of the mural and around the window frames.

---

[12]Plaintiff Cortes spoke about this and the following two works as being part of a time sequence and referred to them that way in shorthand. This work was "Up High 1" as he referred to it, the first in the sequence. The next, "Skulls Cluster," was "Up High 2," and the final work in the sequence, "Up High Orange Skulls," was "Up High 3." Academic Joseph Austin called these "world class displays" according to Ms. Vara. Vara at 747:14-15.

28.    *Jackson Avenue Skulls* [Cortes Folio Exhibit at 38]

"Jackson Avenue Skulls" was recognized by the artistic community (Cortes Folio Exhibit at 44), and by expert testimony (Vara at 775:4-6; 769-770).  Plaintiff Cortes is not claiming that "Jackson Avenue Skulls" was mutilated.

James Rocco

Plaintiff Rocco had his work displayed at the Graffiti Hall of Fame and written up on the Street Art NYC blog, and his work was also featured on the Fresh Paint NYC blog.  Rocco Folio Exhibit at 5; Tramontozzi Folio Exhibit at 16.  He had a show at the Haven Arts Gallery. Rocco Folio Exhibit at 11.  He was employed as a graphic artist working with numerous high-profile companies including Peugeot, MTV, Nestle, Toshiba, McGraw Hill and Sony and others.  Rocco Folio Exhibit at 17-19.  He also maintains a substantial social media presence with about 2,000 followers. *Id.* at 24-27; Vara at 1100-1101. In addition to the general factors described above and his career factors, Plaintiff Rocco's individual work at issue this case was recognized as follows.[13]

29.    *Face on Jackson* [Cortes Folio Exhibit at 38]

"Face on Jackson" was recognized as having artistic merit via expert testimony because of its technical difficulty owing to its large scale and its height off the ground. She also placed great importance on its proximity to the work by Plaintiff Fabara, one of the most influential of all living street artists.[14] Vara at 1098. "Face on Jackson" was mutilated.   Rocco Folio Trial Exhibit at 57-58. Elements of the lowest portion of the artwork are clearly visible and in fact barely touched by

---

[13]Plaintiff Rocco's testimony, and Ms. Vara's testimony about him, were both truncated due to time considerations. Vara at 1095:15-18; Rocco at 1006:15-19.

[14]Ms. Vara testified that Plaintiff Cohen as curator was bestowing a special honor upon Plaintiff Rocco by placing him next to Plaintiff Fabara for generational contrast, explaining that very similar decisions were made by curators of mainstream museums like The Metropolitan Museum of Art and the Museum of Modern Art.

the whitewashing, and the outlines of the higher portions are visible due to dark black paint used to

create the work and the thin, cheap white paint used to cover it.[15]

**30.** *Bull Face* **[Rocco Folio Exhibit at 32]**

"Bull Face" received recognition from a cross section of the general public (Vara at 1101:4-

6) and via expert testimony (Vara at 1096).  "Bull Face" was mutilated.  Rocco Folio Exhibit at 51-

52.  The darker portions of the image showed through the cheap white paint that was applied in a

thin veneer.  As Plaintiff Rocco testified at trial: "You can see parts of the horn, you can see parts of

my crew that I wrote TV for, on the left-hand side, underneath the horn. You can pretty much see

through." Rocco at 1008:8-11.

**31.** *Lord Paz* **[Cortes Folio Exhibit at 36]**

"Lord Paz" was recognized as having artistic merit via expert testimony because it was a

highly unusual display of lettering in a vertical rather than a horizontal format, greatly increasing

the level of difficulty, and because it integrated this unconventional display with classic lettering

techniques with traditional references displaying. Vara at 1097-1098.  Plaintiff Rocco is not

claiming that Lord Paz was mutilated.

<u>Thomas Lucero</u>

Plaintiff Lucero's curriculum vitae is included with his evidence packet, *see* Lucero Folio

Exhibit at 5-6. Among other impressive achievements, he created a significant mural in a public

park for the City of Bakersfield, California, *id.* at 8, is shown by the Finer Things art gallery in

California, *id.* at 13, and was written up by the *Queens Courier* newspaper regarding his exhibition

at the Jeffrey Leder Gallery in New York City, *id.* at 15 (*see also* Vara at 738:23-25).  In addition to

---

[15] Plaintiff Rocco testified: "I could actually see pieces of my tags coming through on the bottom of this. I could see his teeth glairing right through the paint, and I could see bits and pieces of his eye and the heart up there as well." Rocco at 1009:20-23.

17

the general factors described above and his career factors, Plaintiff Lucero's individual work at issue this case was recognized as follows.

**32.** *Black Creature* **[Lucero Folio Exhibit at 26]**

"Black Creature" received recognition from the artistic community (Lucero Exhibit Folio at 32; Vara at 739:19-740:1) and was recognized as having artistic merit via extensive expert testimony relating to the work's complex symbolism. (Vara at 730-733). "Black Creature" was mutilated (Lucero Exhibit Folio at 36). For instance, the outline of the helmet worn by the creature can be seen, as can the Buddha's belly and the light surrounding him.

Esteban Del Valle

Plaintiff Del Valle holds a Master's degree in Fine Art from one of the top ten art schools in the country. Del Valle Folio Exhibit at 5; Vara at 608:1-7, 24-25. He has held many prestigious residencies, fellowships and scholarships. Del Valle Folio Exhibit at 5. Plaintiff Del Valle's resume also lists numerous murals and exhibitions around the world that featured his work (*id.*, *see also* at 12, 18, 20), including a show in Berlin at the Urban Nation museum, the first one ever dedicated to urban art (*id.* at 8-10; Del Valle at 130:24-131:2) as well as invitations to museum conferences and panels. Del Valle Folio Exhibit at 6. His work was written up in the *New York Times* and by the publication *Brooklyn Street Art*. *Id.* at 20-22. And Plaintiff Del Valle has a substantial following on social media. Vara at 632:14-15. In addition to the general factors described above and his career factors, Plaintiff Del Valle's individual work at issue this case was recognized as follows.

**33.** *Beauty and the Beast* **[Del Valle Folio Exhibit at 26]**

"Beauty and the Beast" received recognition from the artistic community (Del Valle Folio Exhibit at 28, 30, 32), from a cross section of the general public (Vara at 633:5-10) and via expert testimony (Vara at 626; 629:3-8; 628:18-20). "Beauty and the Beast" was mutilated. Del Valle Folio Exhibit at 36-37. The blue and orange colors used by the artist are clearly visible beneath the

thin layer of cheap white paint, especially on the back area and leg of the "beast" and the female character's leg.  Del Valle at 129:8-16.

<u>James Cochran</u>

Plaintiff Cochran's distinguished credentials include a Master's Degree in visual arts, multiple positions as an art educator, extensive solo exhibitions and group exhibitions (*see* Cochran Folio Exhibit at 5-6, 30, 37, 38; Vara at 1033:8-12) as well as significant press coverage including by leading outlets such as the *New York Times*, the *Wall Street Journal*, CNN and the *Guardian* (Cochran Folio Exhibit at 8, 41, 50, 60-61; Cochran at 707:15-17). He is credited with playing a major role in developing the street art movement in Australia (*id.* at 8) as well as developing a unique style of pointillism (Madrigale at 1212:14-20). In addition to the general factors described above and his career factors, Plaintiff Cochran's individual work at issue this case was recognized as follows.

**34.   *Subway Rider* [Cochran Folio Exhibit at 70]**

 "Subway Rider" was recognized by the artistic community (Cochran Folio Exhibit at 12, 72, 74, 82, 87; Madrigale at 1212:14-20) as well as a cross section of the general public (*id.* at 68, 76, 78-81) and via expert testimony (Vara at 1025, 1028, 1031).  "Subway Rider" was mutilated. Cochran Folio Exhibit 89-90.

<u>Sandra Fabara</u>

Plaintiff Fabara's voluminous curriculum vitae, Farbara Folio Exhibit at 49-52, which itself is only a list of highlights culled from a long career spanning decades with a far more extensive list of achievements, confirms the testimony of Ms. Vara that Plaintiff Fabara is a nothing less than a historic figure in the history of hip-hop and graffiti culture and is "one of the originators of the language" of these genres of art.  Vara at 1596:17-21. Indeed, her presence at 5Pointz services to confirm its significance as an art institution and strongly supports the stature of the other works in

19

his lawsuit. She has had more than 120 exhibitions, more than 85 major commercial installations, a starring role in a feature film about graffiti and has delivered more than 30 lectures about the art form around the world. Vara at 1596-1597.  She has been written up in the *New York Times*, *Time Out New York*, and the *Observer* among many other publications, and her work has been featured or included in permanent collections at major cultural institutions such as the Whitney Museum, the New Museum, the Queens Museum, the Museum of the City of New York, El Museo del Barrio and the Brooklyn Museum (Fabara Exhibit Folio at 22), as well as by major galleries like Woodward, Sprueth Magers and Jeffrey Deitch. Fabara Exhibit Folio at 5, 7, 9, 16 18, 22, 25, 29, 31, 33-34, 36, 39-40.  In addition to the general factors described above and her career factors, Plaintiff Fabara's individual work at issue this case was recognized as follows.

35. *Green Mother Earth* **[Fabara Folio Exhibit at 54]**

"Green Mother Earth" received recognition from the artistic community (Vara 1600-1604; Madrigale at 1211:19-22), from a cross section of the general public (Vara 1604-1605) and via expert testimony (Vara 1598-1600).  Plaintiff Fabara is not claiming that "Green Mother Earth" was mutilated.

Nicholai Khan

Plaintiff Khan has worked with celebrities such as Martha Stewart, Khan Folio Exhibit 11, and had his art featured by the Bronx Museum of the Arts, written up in the *Times Ledger* newspaper, reviewed by art critics and presented by art galleries.  Khan Folio Exhibit 2, 5, 6, 8-9, 15-16, 18.  His artwork has even been used for the cover of a published children's book currently available for sale.  *Id.* at 13.  He also has a significant presence on social media, with tens of thousands of followers on Instagram. *Id.* at 31. Ms. Vara praised Plaintiff Khan for practicing a innovative variation of the modernist art style of "fauvism." Vara at 1621:6-9 and noted his high level of formal education from the prominent Fashion Institute of Technology.  Vara at 1619:19-20.

In addition to the general factors described above and his career factors, Plaintiff Khan's individual work at issue this case was recognized as follows.

36.   ***Dos Equis Man* [Khan Folio Exhibit at 25]**

"Dos Equis Man" was recognized by the artistic community (Khan Folio Exhibit at 36, 38; Vara at 1623:16-1624:3) and by a cross section of the general public (Khan Folio Exhibit at 29, 32, 33 and 39; Vara at 1624:18-20) as well as by expert testimony  (Vara 1623). "Dos Equis Man" was mutilated. Khan Folio Exhibit at 41-42.  The artist's rainbow palette of colors is clearly distinguishable behind the white paint, especially on the area containing the roll gate and in the lower right portion of the work.

37.   ***Orange Clockwork* [Khan Folio Exhibit at 27]**

"Orange Clockwork" was recognized by the artistic community (Vara at 1623:16-1624:3; 1624:21-23) and by the general public (Khan Folio Exhibit 34; Vara at 1624:18-20). Finally, it was recognized as a work of artistic merit by Ms. Vara (Vara at 1620:12-21; 1621:18-23).  "Orange Clockwork" was mutilated.  Khan Folio at 43-44. The rainbow colors used by the artists remain clearly visible under the white paint, especially the black fedora worn by the character and in the area near the staircase.

<u>Steven Lew</u>

Plaintiff Lew has a highly advanced education in art and design, and a sophisticated background in professional design work.  Lew Folio Exhibit at 5-6. He has designed high-profile products such as Nike and Converse (Lew at 1356; Lew Exhibit Folio at 27-29) and has been written up by publications and gallery press such as Memolition, DNAInfo, the Source magazine and ArtWhino for his participation in major art events such as Art Basel Miami, as well has having his work archived by Getty images.  Lew Folio Exhibit at 11-14, 16, 18-19; Lew 1628:17-19; Vara at 1629.  He also has a significant presence on social media including Instagram and Facebook.  *Id.*

at 32, 44-51 (featuring the Memolition recognition).  In addition to the general factors described above and his career factors, Plaintiff Lew's individual work at issue this case was recognized as follows.

### 38.  *Crazy Monsters* [Lew Folio Exhibit at 53]

"Crazy Monsters" was repeatedly recognized by the art community (Lew Folio Exhibit at 42; Vara at 1627, 1629) and by a cross section of the general public (Lew Folio Exhibit at 34, 36, 38, 40; Vara 1628-30) as well as by expert testimony (Vara at 1625-1627).  "Crazy Monsters" was mutilated.  Lew Folio Exhibit at 55-56 and 58-59.  The character images painted by Plaintiff Lew remain clearly visible behind the thin veneer of cheap white paint.[16]

Rodrigo Henter de Rezende

Plaintiff Rezende has an advanced education in art and an extensive resume of artistic achievements.  Rezende Exhibit Folio at 5.  This includes producing graffiti events, sponsorship by leading brands such as Smirnoff, Adidas and Storvo, delivering art lectures and workshops, and participating in major graffiti festivals such as Recifusion and Favela in Brazil.  *Id.*  Ms. Vara considered his curriculum vitae to be a significant factor in evaluating his artistic achievements at 5Pointz. Vara at 1634:17-21.  He was written up in the *O Globo Rio Times* newspaper and on Street Art NYC, retained for live painting exhibitions in Rio de Janeiro including working with the Japanese firm UNI Posca, working with the firm Compactor e Colorgin at the University of Petropolis, designing skateboards for the TIME SLID firm, and was retained for mural commissions by noteworthy figures such as the Hip Hop producer NO ID.   Rezende Exhibit Folio at 7, 9, 11, 13, 15, 17, 19, 21, 23, 29.  He also edits and publishes the art blog "Keep it Real" and maintains an Instagram page with more than 12,000 followers.  *Id.* at 25-27.

---

[16]In fact, a close analysis of the white paint indicates that it was mutilated more than once, since comparing the two images on Lew Folio Exhibit at 55, taken at different times, indicates that the same spot of the wall in the left image acquired a denser area of paint compared to the image on the right.

39.    *Fighting Tree* **[Rezende Folio Exhibit at 36]**

"Fighting Tree" by Plaintiff Rezende was recognized by the artistic community (*id.* at 42; Vara 1638:10-16) and it was recognized by a cross section of the general public (Rezende Exhibit Folio at 23, 40, 44; Vara at 1639) as well as via expert testimony (Vara at 1634, 1635-1637; 1639:18-19).   "Fighting Tree" was mutilated.  Rezende Folio Exhibit at 50-51.  A large portion of the tree foliage was untouched by the whitewash, while the areas below were only partially covered.

Francisco Fernandez

Plaintiff Fernandez's work was reviewed by Holland Carter, one of the most significant critics in America, Vara at 1656:2-6, he was commissioned to paint the at the stadium of the Miami Dolphins professional football team and this was documented on the front page of the Arts Section of the *New York Times*, he was written up in the prominent *Americas Quarterly* journal as well as other publications such as *Hi Fructose* magazine, Street Art NYC and Art Elephant blogs, and other publications such as *Holland Sentinel* and *Complex*.  Fernandez Folio Exhibit at 2, 5-6, 8-9, 11-14, 16-17, 19, 21-23, 25-26, 36-38.

40.    *Dream of Oil* **[Fernandez Folio Exhibit at 34]**

"Dream of Oil" was recognized by the artistic community (Vara at 1656:17-19, 24; 1615: 2-9; 1656:16-17; Fernandez Folio Exhibit at 38; Madrigale at 1214:12-16) and it was recognized by a cross section of the general public (Fernandez Folio Exhibit at 40-41) as well as via expert testimony (Vara at 1655:9-12). "Dream of Oil" was mutilated. Fernandez Folio at 43-44. The large black area at the base representing the oil slick was left entirely untouched by the whitewash while the upper area containing the figure was partially painted white, with a portion of the headdress and the figure itself are clearly visible behind the veneer of white paint. It is also noteworthy that the image was "bombed" by disgraceful illegal graffiti after being whitewashed, a serious indignity to

23

the artist that was invited by the white wall space that the defendants created (*see* Lew at 1366:20-1367:1).

Luis Gomez

Plaintiff Gomez has received considerable media attention for his art including newspapers such as *The Post and Courier*, *Charleston City Paper* and *Mountain Express*, as well as internet publishers such as Brooklyn Street Art, Street Art NYC, Global Street Art and the artist Court McCracken's website.  (Gomez Exhibit Folio at 5, 7, 9, 15-17, 19-20, 25, 36, 39, 43; Vara 1078:9-14).  In addition, he has been commissioned repeatedly by Hollywood producers to decorate movie sets[17] with is artwork (*id.* at 57-61; Gomez at 904) and has thousands of followers on social media (*id.* at 54).

**41.**   *Inside King Kong* **[Gomez Folio Exhibit at 63]**

 "Inside King Kong" was recognized by the art community (Vara at 1077:18-24) and by a cross section of the general public (Gomez Folio Exhibit at 65; Vara at 1079:4-6, 25).  Finally, Ms. Vara opined that "Inside King Kong" was a work of artistic merit (Vara at 1076: 7-16; 1077:2-14). Plaintiff Gomez is not claiming that "Inside King Kong" was mutilated.

**The Collaborative Works**

For many of the collaborative works, the credentials of the artists have already been stated above. They will not be repeated but should be referenced, as should the general factors establishing stature discussed above which are equally applicable to all the collaborative works.

**42.**   *Japanese Fantasy* **[Miyakami Folio Exhibit at 42]**

 "Japanese Fantasy" by Plaintiffs Miyakami and Game received recognition from a cross section of the general public (*see* Game Folio Exhibit 43; Miyakami Folio Exhibit 7, 51), and it was recognized by Ms. Vara as a work of artistic merit because of its enormous scale, requiring

---

[17]Plaintiff Gomez was prevented from elaborating on the movie work due to time pressure. Gomez at 903:15-25.

significant physical effort to execute, and was designed to be seen from a great distance, meaning a large viewership, and consisted of the signature style of both artist.  Vara at 1057-1058.  Ms. Vara also recognized the work for its "lovely dialogue between two notions, two views of Japanese culture and Japanese notions of femininity." Vara at 1613:25-1614:11.  "Japanese Fantasy" was mutilated.  Miyakami Folio at 65-66. The signatures of both artists were left untouched, as was the hair of the Miyakami character.  Moreover, the mutilation was one of the most egregious because the white paint was used to draw an insulting "smiley face" between the two works, confirming that the works were being desecrated and mutilated in an act of spite.

**43.** *Halloween Pumpkins* **[Cohen Folio Exhibit at 97]**

In addition to the general and career factors for both of the artists as described above "Halloween Pumpkin" by Plaintiffs Cohen and Rezende was recognized by the general public (Vara at 1639:14-17) and it was recognized by Ms. Vara because it was an elaborate and rare production piece that shows mastery of both figurative images and wildstyle expression, creating a "stage that is very conscious of its relationship to the viewers."  Vara at 1637-1638.[18]  "Halloween Pumpkins" was mutilated.  Cohen Folio Exhibit at 140-141.  Large areas of the sky depicted in the upper portions of the work remained visible, as does the work on the roll gate in the lower area.

**44.** *Angry Orchard* **[Cohen Folio Exhibit at 107]**

"Angry Orchard" by Plaintiffs Lamboy, Lucero and Cohen was recognized by the artistic community (Lamboy Folio Exhibit at 72; Madrigale 1210:16-23), by a cross section of the general public (Lamboy Folio Exhibit at 70) and in expert testimony.  Ms. Vara found the work to have artistic merit because it had special value as a "production" work which involved a narrative with both characters and wildstyle, and as such was the "highest level" of the art form. Vara at 735:10-

---

[18]Although time did not permit Ms. Vara to discuss the details of artistic community recognition, she testified that the work met all three VARA standards for artistic merit.  Vara 1639:18-19.

14.[19]  "Angry Orchard" was mutilated (Cohen Folio Exhibit at 150-151).  In fact the work was

defaced, with most of the white paint being concentrated on faces and lettering and vast swaths of

background left untouched or transparent, and it was then "bombed" extensively with illegal

graffiti.

William Tramontozzi

Plaintiff Tramontozzi identified himself as a uniquely qualified artist because of his skill

level in both hip hop music and street art, something matched by no other person.  Tramontozzi

959:19-22.  In fact, he was cited in the book *The Warhol Economy*, used as a text by Ms. Vara, both

for his artistic and his musical skill.  Vara at 1093:8-23.   He was interviewed by *Time Out New

York* magazine, which ran a photograph of "Jimi Hendrix Tribute", as well as the "Word is Bond"

and "Fresh Paint NYC" and "CMJ" street art publications.  Tramontozzi Folio Exhibit at 5, 7, 14,

16.  CMJ reported that Plaintiff Tramontozzi was a member of the world famous "Rock Steady

Crew" which toured the globe giving more than 1,200 shows in more than 40 countries. *Id.* at 14.

Ms. Vara noted that Professor Joseph Austin confirmed for her Plaintiff Tramontozzi's importance

in the street art world, Vara at 1094:8-10.

**45.   *Jimi Hendrix Tribute* [Rocco Folio Exhibit at 40]**

 "Jimi Hendrix Tribute" by Plaintiffs Rocco and Tramontozzi was recognized by the artistic

community (Tranmontozzi at 27; Vara 1094:17-24) and a cross section of the general public

(Tramontozzi Folio Exhibit at 21, 23-25) as well as by expert testimony (Vara 1091-1092).  "Jimi

Hendrix Tribute" was mutilated.  Rocco Folio Exhibit 60-61.  The images on the roll gates were not

---

[19]Ms. Vara found the work to render a "sense of depth" that was the "sign of a good artist" placing
the viewer within the landscape and requiring a great deal of planning, time and energy to create, as well as
significant effort and skill. Vara at 735-735. She also concluded that the recognition the work received from
the "Angry Orchard" cider company itself was important. Vara at 741:15-23.  While Plaintiff Lamboy only
worked on a small portion of the wall, Ms. Vara found that his work was of artistic merit due to the difficulty
of maximizing the potential of a small space and his ability to synchronize with the works of the other artists
so that it appeared one hand had created the entire work.  Vara at 1073-1074.

effectively covered by white paint and remained visible, and the orange silhouettes of the wildstyle

lettering appear through the transparent paint, as does the blue and green background on the left side

of the mural.

Bienbenido Guerra and Carlo Nieva

The artists who created "Return of New York" were notably accomplished.  Plaintiff Guerra

holds a university degree in fine art and is certified and experienced as a teacher of art, and has had

his work shown in numerous galleries and placed for sale at auction as well as receiving private

commissions.  Guerra Folio Exhibit 5, 9, 13-14; Guerra at 507:17-21. Plaintiff Nieva created a

major mural work for the leading New York City cultural institution El Museo del Barrio which

received significant media attention, Nieva Folio Exhibit at 7, 8, 9-10, 12-14, 16, 18, and showed

his work in significant galleries, *id.* at 5. He has worked extensively creating art for leading fashion

brands such as Dolce & Gabana (Nieva at 380:15-381:4; 396:6-11).  He had a large social media

following.  Vara at 685:11-15.

46.     *Return of New York* [Guerra Folio Exhibit Folio at 16]

"Return of New York" by Plaintiffs Guerra and Nieva was recognized by the artistic

community (Guerra Evidence Folio at 18, 26, 30, 32) and by a cross section of the general public

(*see* Guerra Evidence Folio at 20, 22, 24, 28, 34; Nieva Exhibit Folio at 26).[20]   Moreover, Ms. Vara

opined that "Return of New York" was a work of artistic merit because of its historical significance

as a complex production by New York artists about their city, its exceptional references to Queens

culture, its use of Hollywood iconography, its massive size and the fact that it was executed without

the assistance of projection technology through painstaking effort and skill.  Vara at 671-673.

"Return of New York" was mutilated.  Guerra Folio Exhibit 36-37. The outline of the King Kong

---

[20]Ms. Vara noted that since the work had a limited opportunity to develop recognition on social
media due to its short life span from completion to destruction, this recognition was all the more remarkable
and demonstrative of its significance.  Vara at 681:19-23.

image is recognizable and the upper portions with the blue sky background were untouched by white paint, as were the sunset colorations above the skyline. Plaintiff Nieva also testified that the whitewash specifically targeted the artist names, leaving other areas untouched.  Nieva at 389:18-22.

### 47.    *Underwater Fantasy* [Cohen Folio Exhibit Folio at 101]

"Underwater Fantasy" by Plaintiffs Cohen and Miyakami was recognized by the artistic community repeatedly (Miyakami Folio Exhibit at 17, 19, 55; Tramontozzi Exhibit Folio 23; Vara at 1616:1-4, 17-23).  The work was also recognized by a cross section of the general public (Miyakami Folio Exhibit at 45-47; Vara at 1616-1618).  Finally, Ms. Vara determined that "Underwater Fantasy" is a work of artistic merit because it is a rare elaborate production piece and because it presents an intriguing color scheme the represents complex notions and stereotypes of women, contrasting the color scheme with complex feminist iconography.  Vara 1609-1610. "Underwater Fantasy" was mutilated.  The steel vent at the center of the piece was not whitewashed at all, the color scheme remains clearly visible beneath the thin veneer of white paint, especially on the pilasters, and various border areas were not touched by the white paint. Moreover, Plaintiff Cohen testified that the work was painted over twice, such that there was an intervening mutilation that was even more egregious.  Cohen at 1488:15-18.

### 48.    *Save 5Pointz* [Cohen Folio Exhibit Folio at 109]

"Save 5Pointz" by Plaintiffs Cohen and Miyakami was recognized by the artistic community (Vara at 1616).  It was recognized by a cross section of the general public (Miyakami Exhibit Folio at 48-49; Vara at 1616:12-16; 1618:6-9). Finally, it was recognized as a work of artistic merit by Ms. Vara, who emphasized the audaciousness of Miyakami's character, the dynamic fluidity of Cohen's lettering and the unification of styles and skills by the two artists to create a production of exceptional value.  Vara at 1610-1611; 1653:24-1654:2.   "Save 5Pointz" was

mutilated.  Miyakami Exhibit Folio at 59-60.  Both Miyakami's character and Cohen's lettering are clearly visible behind the thin veneer of cheap white paint.

<u>Maria Castillo</u>

Plaintiff Castillo was recognized by Ms. Vara as having attracted an extraordinary level of publicity for her work. She has contracts with luxury brands like Ray Ban and Nike, coverage in leading publications like *Vibe* magazine, was featured in a leading book about graffiti art and even has a line of figurines from KidRobot, as well as a powerful presence on social media.  Vara at 639-42, 646-647; Castillo Folio Exhibit at 17, 19, 21, 38.  Ms. Vara characterized these achievements as "very very difficult" for an artist without a major corporation backing her. *Id.* at 646:18-25.  Ms. Vara also found nearly a dozen online videos featuring Plaintiff Castillo's work.  *Id.* at 645:17-19.

**49.    *Love Warrior and Burner* [Cohen Folio Exhibit Folio at 99]**

 "Love Warrior and Burner" by Plaintiffs Cohen and Castillo received recognition from the artistic community (Cohen Folio Exhibit at 122, 130; Madrigale 1208:3-6) and from a cross section of the general public (Castillo Folio Exhibit at 51-53, 55, 57, 59-61, 63).  Finally, Ms. Vara stated that "Love Girl and Burner" was a work of artistic merit because it was an epic collaboration that was evocative of the very history of 5Pointz as an institution. Vara at 635:8-25. She praised the monumental size of the piece, the use of Plaintiff Castillo's signature character as part of an ongoing narrative in combination with the signature wildstyle form of Plaintiff Cohen showing exceptional fluidity, and the symbolic statement by the mature Plaintiff Castillo that she has risen to stand equal with Plaintiff Cohen. Vara at 636-637.  She called the work significant to the history of graffiti. *Id.*  "Love Warrior and Burner" was mutilated (Cohen Folio Exhibit at 142-143).  The wildstyle lettering and blue coloration are visible through the white paint or left bare (as in the upper right and lower left areas).  Castillo at 255.  Moreover, Plaintiff Cohen testified that the work

was painted over twice, such that there was an intervening mutilation that was even more egregious. Cohen at 1488:5-14.

**III.    The Evidence Supports a Significant Award of both Statutory and Actual Damages as to All 49 Works of Art**

For the reasons set forth below, the award of statutory damages should significantly exceed the $30,000 ordinary damage cap for each of the 49 works of art at issue.

**A.    A Significant Award of Statutory Damages Should be Made**

The maximum amount of statutory damages should be awarded to each work that qualifies for damages.  As shown below, Mr. Wolkoff's destruction of the artworks was done with willful disregard of VARA rights he was on formal legal notice about, and therefore the fact finder can award up to $150,000 per work of art as damages.

**1.    The Policy Underlying Statutory Damage Awards is Important**

During the trial, there was testimony from the expert witnesses about the famous artist Vincent Van Gogh.  The experts explained that although Van Gogh's canvases currently sell for millions of dollars each, during his lifetime almost nobody wanted to buy them and they had very little value in the marketplace.  The VARA statute was written in part to protect artwork that the general public does not place a high financial value on during the artist's lifetime.  Part of the purpose of VARA is to save from destruction works of art that do not yet have a high financial value in the marketplace because the general public does not yet appreciate them.[21]  Without such a rule, it would easy for us to lose great masterpieces like the canvases of Van Gogh because those

---

[21] VARA protects this kind of artwork in three ways. First, VARA allows a trained expert to identify a work as having artistic merit even though it does not have public acceptance. Second, VARA protects works that lack artistic merit in anyone's eyes if they are mutilated to the detriment of the artist's reputation. And most importantly, VARA allows the fact finder to award very substantial "statutory" money damages to an artist whose VARA rights are violated even if the artwork did not have great (or indeed any) financial value in the marketplace (that is, even if the artist could not prove substantial "actual" damages arising from the destruction or mutilation of his work).

who would destroy them would know they would not face a serious financial penalty for their

terrible acts of destruction if the only penalty was the financial value of the work.[22]

### 2.   The Defendants' Conduct was Willful

Mr. Wolkoff was sued by the artists pursuant to VARA before he whitewashed the artwork.

In the lawsuit, the artists warned Mr. Wolkoff that if he destroyed their artwork he might be

violating the VARA statute.  They asked the Court to protect their artwork from destruction based

on VARA.  Mr. Wolkoff went to court to defend himself from that lawsuit. He knew all about

VARA, and he knew he had to wait for the Court's permission before he demolished his building

because of the effect of the VARA statute. He even knew that a temporary restraining order had

been issued by the Court because of VARA's potential protection of the work.  Mr. Wolkoff

testified in his deposition that he didn't want to wait for the three-month period specified by VARA

to destroy the artwork because he didn't want to give the artists the chance to protect their artwork.

11/3/17 Trial Transcript 49:1-5.[23]

### 3.   The Elements of Statutory Damages Strongly Support a Significant Award

When deciding on the amount of statutory damages the law instructs that it is necessary to

consider Mr. Wolkoff's state of mind, the profits earned by Mr. Wolkoff, the revenue lost by the

Plaintiffs, the deterrent effect on both Mr. Wolkoff and on third parties in the future, and the

---

[22] The plaintiffs believe there is more than enough evidence to conclude that each of their works had a financial value in the marketplace in excess of $50,000.  But even if the fact finder were to conclude that the defense expert was correct that none of them has any financial value at all, which is not the case for the reasons explained below, if the works had artistic merit or were mutilated to the detriment of the artist's reputation, the fact finder not only may but must still award statutory damages.

[23] In other words, Mr. Wolkoff intentionally disregarded the measures he could have taken to safeguard the artists' VARA rights and he willfully chose to violate them. He said he didn't want to give them the chance to protect their artwork because he didn't want to them to be "irrational" and get arrested trying to stop the demolition.  *Id*. This contention should not be believed because Mr. Wolkoff could not give consistent or detailed testimony about it (indeed as shown below he admitted that he had never known the artists to violate the law in any way) and because it is self-serving and he had no corroboration, but whether it is believed or not is irrelevant to the question of whether Mr. Wolkoff knew he might be violating VARA if he destroyed the works of art without giving a three-month notice. He knew it because he had been sued under VARA long before that.

conduct and attitude of the parties.  The fact finder can choose to place as much or as little weight on each of these factors as is deemed appropriate, but should consider each of them to some extent. A review of these factors argues strongly that the maximum award of statutory damages should be made to each artist found qualified to receive such compensation.

(a)   The deterrent effect on both Mr. Wolkoff and on third parties

The most important factor to consider in deciding the amount of statutory damages is the fact that Mr. Wolkoff is by his own admission enormously wealthy. Mr. Wolkoff not only admitted but bragged about being one of the largest real estate developers in Brooklyn and Staten Island. 11/3/17 Trial Transcript 55:7-9.  Mr. Wolkoff explicitly testified that he would do the whitewashing all over again if he had the chance, clearly indicating that without a very significant award of statutory damages his misconduct will not be deterred in the future.  11/3/17 Trial Transcript 43:3. VARA requires a decision as to how much money Mr. Wolkoff, and other people in the world like him, must pay in order for them to understand that they must not destroy artwork but must cherish and protect it. VARA requires sending a message not just to Mr. Wolkoff but to everyone who might think about destroying works of art that they should think twice.

(b)   Mr. Wolkoff's state of mind when he destroyed the artwork

Mr. Wolkoff testified that he whitewashed the art in the middle of the night using the cheapest paint[24] he could find, and the fact finder saw the horrifying results of this whitewashing in the plaintiff exhibit folios.  11/3/17 Trial Transcript 40:24; 42:3-4.  The white paint stands out against the building and screams to the world that the artwork had been wiped out.  One could see through the cheap paint (*see*, e.g., Cohen Folio Exhibit at 105), and the painters didn't even take the trouble to cover all parts of each work with a thin veneer of paint.   Mr. Wolkoff acted with a nasty,

---

[24]Plaintiff Takabayashi, who has extensive experience with and knowledge of paints, testified that based on his observations he believed the white paint had been watered down before being applied, contradicting Mr. Wolkoff's denials that this occurred and further exacerbating Mr. Wolkoff's misconduct in regard to statutory damages. Takabayashi at 315:16.

vengeful, arrogant state of mind when he destroyed the artwork, so this factor is a strong reason to award a large amount of statutory damages.

(c)     The profits earned by Mr. Wolkoff

Mr. Wolkoff testified that he earned a huge amount of money, $200,000, licensing film and TV companies to shoot on his property using the plaintiffs' artwork as a background.  11/3/17 Trial Transcript 4:21. He never shared any of that money with the plaintiffs.  This is a strong reason to award a large amount of statutory damages to the plaintiffs.[25]

(d)     The revenue lost by the Plaintiffs

Each of the plaintiffs testified how important 5Pointz was to them as a way of getting paid artistic employment.  They complained that as the whitewash stood for month after month, it made them look bad in the artistic community, especially the street art community (*see* Nieva at 417:20-418) and therefore made it harder for them to find paid work (*see, e.g.*, Takabayashi 315:23-316:4; Del Valle 131:15) especially since it was publicized via the Internet.  Cohen 1480:11-15.  Plaintiff Cohen testified that the world was able to view the whitewash for "over a year" after it occurred. Cohen at 1466:4.  This is another reason to award a large amount of statutory damages to the plaintiffs.

(e)     The conduct and attitude of the parties

Mr. Wolkoff admitted at his deposition and at trial that artists always followed the law and always followed the rules he made for them. 11/3/17 Trial Transcript 37:21. But Mr. Wolkoff didn't follow the rules.  Even though the artists had sued him two months earlier and told him in their lawsuit that they thought their works of art were protected by the VARA statute, he snuck onto the site under cover of night and painted some the works of art white, then as shown above he repeated the whitewashing in a pervasive matter until all the works of art had been damaged at least once,

---

[25] Of course, the fact that so many film and TV companies were interested in filming the artwork also shows that the artwork had artistic merit and significant financial value.

some more than once, over an extended course of time, inviting future damage to the artist's rights in the form of illegal "bombing."  He admitted that doing this was not necessary to his demolition project.  11/3/17 Trial Transcript 77:21.  This willful misconduct warrants substantial damages.

More importantly, Mr. Wolkoff made gross self-serving misrepresentations to the Court in order to obtain relief from a preliminary injunction which might have saved the artwork for posterity and avoided the need for him to pay any money damages.  Mr. Wolkoff told the Court, through his attorneys, that he would demolish his building before the end of 2013 because it was absolutely urgent for him to do, alleging that otherwise he would lose millions of dollars in credits and his project would founder, 11/3/17 Trial Transcript 21:12-15, and then he did not even obtain a demolition permit until the spring of the following year and took a full year, into 2015, after the permit was obtained to complete the demolition. Cohen at 1465:17-20; 1466:2-4; 11/3/17 Trial Transcript 18:14.  This self-serving misrepresentation was made to the Court in order to avoid the possibility that the art would be preserved, a fundamental attack on the VARA statute and its policies.  Mr. Wolkoff also asserted a frivolous counterclaim against Plaintiff Cohen and took other actions that were improper and not indicative of good faith.  *See supra* note 3.

B.      The Plaintiff's Appraisals Should be Awarded as Actual Damages

If the court does not award the maximum amount of statutory damages for each work of art (which the plaintiffs concede exceeds their actual damage) then it should determine whether the actual damages for that work, the appraised value as established by the plaintiff's expert witness, exceed the amount of statutory damages awarded.[26] The only basis available to the fact finder for discrediting the testimony of the plaintiff's appraiser was the testimony of the defendants' expert that the substantial cost of removal washed out actual damages for many of the works of art at

---

[26]For works that were mutilated, the Court also needs to add the amount of damages awarded for reputational harm and this amount to the appraisal amount awarded before comparing the actual damage award to the statutory damage award.  *See supra* note 8.

issue.[27]  However, the defense did not introduce any evidence at all, including not calling any counter expert, to dispute the highly credible testimony of the plaintiffs' conservation expert Harriet Alden.  Ms. Alden testified, and an exhibit was marked into evidence to reflect (*see* Plaintiff's Exhibit 1270), that there was no substantial removal coast for a significant number of the works at issue.[28] Therefore the appraisal cost of the removable works should be awarded as actual damages.[29]

## V.      CONCLUSION

For all of the foregoing reasons, the Plaintiffs should be awarded a significant amount of statutory damages for each work of art at issue in this case or actual damages in the alternative.

Dated:        New York, New York
              December 18, 2017

                                        EISENBERG & BAUM, LLP


                                        By:_____/s/ Eric M. Baum_____
                                             Eric M. Baum, Esq. (EB-5493)

---

[27] The only other basis fact finder could have to undercut the plaintiffs' appraisal was the testimony from the defendants' expert that the plaintiffs lacked the ability to obtain clear title to their works of art, but Mr. Wolkoff confirmed that because he was demolishing his building he would have permitted any artist to remove any work of art they desired to keep.  11/3/17 Trial Transcript 10:20-23.  The defense appraisal expert lacks credibility because his opinion did not reflect this reality.

[28] The works were painted on substrate such as applied plywood, drywall, siding or roll gates which could be detached from the building without damaging either the artwork or the building (a building which needed no repair since it was slated for demolition).  The defendants' expert did not rebut the fact that some of the works were removable by the artists themselves at little or no cost, and therefore presented none of the financial baggage to a potential auction purchaser that the other works allegedly did and also presented no title issues. He gave no reasonable basis for an opinion that such works could not be sold at auction.

[29] The works which Ms. Alden identified as removable, followed by their appraised value, were as follows: (1) Black and White 5Pointz Girl, $70,537.50;  (2) Starry Night, $52,250; (3) Monsters II, $54,340; (4) Patience, $84,645;  (5) Character, $78,375; (6) Meres Outdoor Wildstyle, $78,375; (7) Halloween Pumpkin, $78,375; (8) Inside 4th Floor, $52,250; (9) Logo for Clothing Brand, $54,340; (10) Red, $62,700; (11) Denim Girl, $67,925; (12) Faces on Hut, $73,150. In addition to these works, the appraised value should be awarded to the works that required significant removal costs because there is no legal requirement that the appraised value be offset by such costs and because any such offset would undermine the preservationist purposes of VARA, possibly reducing the available actual damages for certain kinds of artwork to a nominal amount and therefore encouraging rather than deterring their destruction.

35