UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------x

JONATHAN COHEN, SANDRA  Case No. 13-CV-05612(FB)(RLM)
FABARA, STEPHEN EBERT, LUIS
LAMBOY, ESTEBAN DEL VALLE,
RODRIGO HENTER DE REZENDE,
DANIELLE MASTRION, WILLIAM
TRAMONTOZZI, JR., THOMAS
LUCERO, AKIKO MIYAKAMI,
CHRISTIAN CORTES, DUSTIN
SPAGNOLA, ALICE MIZRACHI,
CARLOS GAME, JAMES ROCCO,
STEVEN LEW, FRANCISCO
FERNANDEZ, and NICHOLAI KHAN,

   Plaintiffs,

 -against-

G&M REALTY L.P., 22-50 JACKSON   **DECISION**
AVENUE OWNERS, L.P., 22-52
JACKSON AVENUE, LLC, ACD
CITIVIEW BUILDINGS, LLC, and
GERALD WOLKOFF,

   Defendants.
--------------------------------------------------x

MARIA CASTILLO, JAMES COCHRAN, Case No. 15-CV-3230(FB)(RLM)
LUIS GOMEZ, BIENBENIDO GUERRA,
RICHARD MILLER, KAI
NIEDERHAUSEN, CARLO NIEVA,
RODNEY RODRIGUEZ, and KENJI
TAKABAYASHI,

   Plaintiffs,

 -against-

G&M REALTY L.P., 22-50 JACKSON
AVENUE OWNERS, L.P., 22-52
JACKSON AVENUE, LLC, ACD
CITIVIEW BUILDINGS, LLC, and
GERALD WOLKOFF,

                          Defendants.
-----------------------------------------------x

*Appearances:*
*For the Plaintiff*                    *For the Defendant*
ERIC BAUM                              DAVID G. EBERT
ANDREW MILLER                          MIOKO TAJIKA
Eisenberg & Baum LLP                   Ingram Yuzek Gainen Carroll &
24 Union Square East                   Bertolotti, LLP
New York, NY 10003                     250 Park Avenue
                                       New York, NY 10177

**BLOCK, Senior District Judge:**

## <u>TABLE OF CONTENTS</u>

I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A. The Relevant Statutory Framework . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B. The Advisory Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    C. The Witnesses and Evidentiary Landscape . . . . . . . . . . . . . . . . . . . . . . . 13

III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    A. The Advent and Evolution of 5Pointz . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    B. The Walls. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        1. Covering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        2. Short-Term Rotating Walls vs. Long-Standing Walls . . . . . . . . . . 19

    C. The Planned Demolition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    D. The Whitewashing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    A. Temporary Works of Art. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    B. Works of Recognized Stature . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        1. Recognized Stature of Individual Artworks . . . . . . . . . . . . . . . . . . 32

            a.  The Long-Standing Works . . . . . . . . . . . . . . . . . . . . . . . . . . 32

            b.  Other Works . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    C. Mutilation and Prejudice to Honor or Reputation . . . . . . . . . . . . . . . . . . 35

V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

    A. Actual Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

    B. Statutory Damages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

        1. Willfulness. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

        2. The Statutory Factors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

a. The Infringer's State of Mind . . . . . . . . . . . . . . . . . . . . . . . . . . 46

b. The Expenses Saved, and Profits Earned, by the Infringer . . 47

c. Revenue Lost by the Copyright Holder . . . . . . . . . . . . . . . . . 47

d. The Deterrent Effect on the Infringer and Third Parties . . . . 48

e. The Conduct and Attitude of the Parties . . . . . . . . . . . . . . . . 49

3. The Statutory Damages Award . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-1

This marks the latest chapter in the ongoing saga of what has commonly become known as the 5Pointz litigation. Plaintiffs, 21 aerosol artists, initiated this lawsuit over four years ago by seeking a preliminary injunction under the Visual Artists Rights Act of 1990 ("VARA"), 17 U.S.C. § 106A, against defendants Gerald Wolkoff ("Wolkoff") and four of his real estate entities to prevent the planned demolition by Wolkoff of his warehouse buildings in Long Island City and consequent destruction of plaintiffs' paintings on the walls of the buildings.

**I**

On November 12, 2013, after a hearing, the Court issued an order denying preliminary injunctive relief and stating that "a written opinion would soon be issued." ECF No. 34. Rather than wait for the Court's opinion, which was issued just eight days later on November 20th, Wolkoff destroyed almost all of the plaintiffs' paintings by

whitewashing them during that eight-day interim.

In its extensive opinion the Court initially noted that Wolkoff's buildings "had become the repository of the largest collection of exterior aerosol art . . . in the United States" and that this litigation "marks the first occasion that a court has had to determine whether the work of an exterior aerosol artist—given its general ephemeral nature—is worthy of any protection under the law." *Cohen v. G & M Realty L.P.*, 988 F. Supp. 2d 212, 214 (E.D.N.Y. 2013) ("*Cohen I*").

In denying the plaintiffs' application for preliminary injunctive relief, the Court recognized that the rights created by VARA were at tension with conventional notions of property rights and tried to balance these rights. It did so by not interfering with Wolkoff's desire to tear down the warehouses to make way for high-rise luxury condos, but cautioned that "defendants are exposed to potentially significant monetary damages if it is ultimately determined after trial that the plaintiffs' works were of 'recognized stature'" under VARA. *Cohen I*, 988 F. Supp. 2d at 227.

The trial has now happened. It lasted three weeks. At plaintiffs' insistence, it was tried before a jury, but just prior to summations, plaintiffs—with defendants' consent—waived their jury rights. Rather than summarily dismiss the jury after it had sat through the entire trial, the Court converted it to an advisory jury. During its charge, the Court carefully explained the parties' rights and obligations under VARA, including the plaintiffs' entitlement to substantial statutory damages if the jury determined that

5

Wolkoff had violated plaintiffs' VARA rights and that he had acted willfully. On a 98-page verdict sheet, the jury found liability and made various damage awards in respect to 36 of plaintiffs' 49 works of art that were the subject of the lawsuit. In every case they found that Wolkoff had acted willfully.

Although the Court does not agree with all of the jurors' findings, it does agree that Wolkoff willfully violated plaintiffs' VARA rights in respect to those 36 paintings. The Court further finds that liability and willfulness should attach to an additional nine works.

Given the abject nature of Wolkoff's willful conduct, the Court awards the maximum statutory damages under VARA for each of the 45 works of art wrongfully and willfully destroyed in the combined sum of $6,750,000.[1]

## II

### A. The Relevant Statutory Framework

As the Court explained in *Cohen I*, "VARA amended existing copyright law to add protections for two 'moral rights' of artists: the rights of *attribution* and *integrity*." *Cohen I*, 988 F. Supp. 2d at 215. VARA has codified the right to integrity to provide "the author of a work of visual art" the right

(A) to prevent any intentional destruction, mutilation, or other modification of that work which would be prejudicial to his or her honor

---

[1] This decision constitutes the Court's combined findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

6

or reputation, and any intentional distortion, mutilation, or modification of that work is a violation of that right, and

(B) to prevent any destruction of a work of recognized stature, and any intentional or grossly negligent destruction of that work is a violation of that right.

17 U.S.C. § 106A(a)(3).

Thus, in *Cohen I*, the Court held that plaintiffs' aerosol art comes under VARA's protection as works of "visual art", *Cohen I*, 988 F. Supp. 2d at 216, and that, under § 106A(a)(3)(B), VARA "gives the 'author of a work of visual art' the right to sue to prevent the destruction of [the] work if it is one of 'recognized stature,'" *Cohen I*, 988 F. Supp. 2d at 215. VARA also permits the artist to seek monetary damages under § 106A(a)(3)(A) if the work was distorted, mutilated, or otherwise modified to the prejudice of the artist's honor or reputation.

Section 113(d)(1) of VARA provides that

In a case in which –

(A) a work of visual art has been incorporated in or made part of a building in such a way that removing the work from the building will cause the destruction, distortion, mutilation, or other modification of the work as described in section 106A(a)(3), and

(B) the author consented to the installation of the work in the building either before the effective date set forth in section 610(a) of the Visual Artists Rights Act of 1990, or in a written instrument executed on or after such effective date that is signed by the owner of the building and the author and that specifies that installation of the work may subject the work to destruction, distortion, mutilation, or other modification, by reason of its removal,

then the rights conferred by paragraphs (2) and (3) of section 106A(a) shall not apply.[2]

Section 113(d)(2) provides, in part, that

If the owner of a building wishes to remove a work of visual art which is a part of such building and which can be removed from the building without the destruction, mutilation, or other modification of the work as described in section 106A(a)(3), the author's rights under paragraphs (2) and (3) of section 106A(a) shall apply unless–

(A) the owner has made a diligent, good faith attempt without success to notify the author of the owner's intended action affecting the work of visual art, or

(B) the owner did provide such notice in writing and the person so notified failed, within 90 days after receiving such notice, either to remove the work or to pay for its removal.

Thus, § 113(d) provides for two possibilities when a protected work of art has been integrated into a building subsequent to June 1, 1991, VARA's effective date. "Section 113(d)(1) deals with works of visual art that *cannot be removed* without causing destruction, mutilation, or other modifications to the work. Section 113(d)(2) deals with works of visual art that *can be removed* without causing such harm." 5 William F. Patry, *Patry on Copyright* § 16:32 (2017) ("*Patry*") (emphasis added).[3]

---

[2] Paragraph (2)—not applicable in this case—protects the right of attribution by affording the artist "the right to prevent the use of his or her name as the author of the work of visual art in the event of a distortion, mutilation, or other modification of the work which would be prejudicial to his or her honor or reputation[.]"

[3] Patry participated in the drafting of VARA in his role as a Policy Planning Advisor to the Register of Copyrights. *Patry* § 16:1 n.1. Accordingly, the Court

Under § 113(d)(1), if a work *is not removable* without destroying, mutilating, distorting, or otherwise modifying the work, the artist's VARA right of integrity under § 106A(3) attach, and the artist may sue to prevent the destruction of the work unless the right is waived "in a *written instrument . . . that is signed by the owner of the building and the author* and that specifies that installation of the work may subject the work to destruction, distortion, mutilation, or other modification, by reason of its removal." § 113(d)(1)(B) (emphasis added).

Under § 113(d)(2), if a work *is removable* without destroying, mutilating, distorting, or otherwise modifying it, VARA gives the artist the opportunity to salvage the work upon receipt of a 90 days' written notice from the building owner of the owner's "intended action affecting the work of visual art." 17 U.S.C. §§ 113(d)(2)(A)-(B). If the artist fails to remove or pay for the removal of the works within the 90 days —or if the owner could not notify the artist after making a "good faith effort," 17 U.S.C. § 113(d)(2)(A)—the artist's VARA rights are deemed waived for the removable work, and the owner may destroy them without consequences.[4]

Damages that may be awarded for the violation of the artist's rights of attribution and integrity under § 106A(a)(3) are the same that apply for copyright

accords his treatise, which is highly regarded on all copyright issues, particular weight when examining provisions of VARA.

[4] Section 113(d)(2)(B) also provides that if the artist successfully removes a work at his or her own expense, title to the work passes automatically to the artist. *See* 17 U.S.C. § 113(d)(2)(B).

infringement, namely actual (including profits) and statutory. 17 U.S.C. § 504(a). As the House Judiciary Committee Report explained:

> Section 6(a) of the bill simply amends section 501(a) of title 17 to add those authors covered by new section 106A . . . . It thereby makes all title 17 remedies [except criminal sanctions] available to those authors . . . . [VARA] thereby provides for monetary damages, and for injunctive relief to prevent future harm. *The same standards that the courts presently use to determine whether such relief is appropriate for violations of section 106 rights will apply to violations of section 106A rights as well.*

H.R. Rep. No. 101-514, at 21-22 (1990) (emphasis added).

There is no limit to the amount of actual damages for each work, but statutory damages for each may be "not less than $750 or more than $30,000 as the court considers just." 17 U.S.C. § 504(c)(1). If, however, the plaintiff "sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages" for each work "to a sum of not more than $150,000." 17 U.S.C. § 504(c)(2). The plaintiff is not entitled to both actual and statutory damages but must elect one or the other "before final judgment is rendered[.]" 17 U.S.C. § 504(c)(1).

**B. The Advisory Jury**

"A proper demand [for a jury trial] may be withdrawn only if the parties consent." Fed. R. Civ. P. 38(d). Here the defendants, through counsel, consented to submitting the case to the Court.

10

Under the federal rules, where the right to a jury trial does not attach, "the court, on motion or on its own: (1) may try any issue with an advisory jury[.]" Fed. R. Civ. P. 39(c). "Because advisory juries permit community participation and may incorporate the public's views of morality and changing common law, their use is particularly appropriate in cases involving community-based standards." *NAACP v. Acusport Corp.*, 226 F. Supp. 2d 391, 398 (E.D.N.Y. 2002) (Weinstein, J.).

"[A district court] is not bound by the findings of the advisory jury, which it is free to adopt in whole or in part or to totally disregard[.]" *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 907 (2d Cir. 1993) (quoting *Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 122 (5th Cir. 1973)). "[T]he court retains the ultimate responsibility for findings of fact and conclusions [of law] . . . in reliance upon the advisory jury's verdict if the court so chooses, and to explain how it arrived at those findings and conclusions." *DeFelice v. Am. Int'l Life Assurance Co. of New York*, 112 F.3d 61, 65 (2d Cir. 1997).

Under these principles, the Court will take the jury's verdicts under advisement in making its independent findings of fact and conclusions of law, especially on issues that require judgment of the community.[5]

---

[5] During the trial and in their post-trial brief, defendants argued that several comments by the Court, and the Court's rejection of defendants' requested jury instructions, prejudiced the jury to the point of requiring a mistrial. The Court disagrees for the reasons stated on the record at the time of the objections. However, even assuming arguendo that the jury had been prejudiced, because the

The Court would be remiss if it did not pause to acknowledge the extraordinary work of the eight jurors. Rarely were they late during the course of the extensive trial, and the Court was impressed with their rapt attention to the difficult task that awaited them in having to assess the defendants' liability in respect to each of the 49 works of art. Since the jurors had spent the better part of a month in anticipation of deliberating, the Court was disinclined to summarily dismiss them when, at the veritable 11th hour, the plaintiffs suddenly decided to convert the case to a bench trial. Moreover, since 5Pointz had achieved worldwide community recognition, the Court was keen to learn whether the jurors, as members of the community, would view the works as having achieved recognized stature under VARA. To enhance the integrity of their verdicts, the Court decided it best not to tell the jurors that their findings would only be advisory.

The complexity of the litigation did not deter the jurors from making individualized findings in respect to each of the 21 artists and their 49 works on the 98-page verdict sheet. They were tasked with having to determine whether each destroyed work was of recognized stature and/or was mutilated, distorted, or otherwise modified to the prejudice of the artist's honor or reputation by the whitewashing. They found that 28 of the 49 destroyed works had achieved recognized

---

jury was advisory, and the Court is making its own findings of fact and conclusions of law, any prejudice would have been harmless.

stature, and eight more had been mutilated, distorted, or otherwise modified to the prejudice of the artists' honor or reputation.[6] Each of the 21 plaintiffs were adversely affected in one way or the other, and the jury had to individually assess whether actual and statutory damages were warranted in regard to each work. It awarded a total of $545,750 in actual damages and $651,750 in statutory damages.

## C. The Witnesses and Evidentiary Landscape

Each of the 21 plaintiffs/artists testified; they were respectful, articulate and credible. Folios for each were admitted into evidence collectively containing their professional achievements and recognition in the form of an impressive array of fellowships, residences, public and private commissions, teaching positions, media coverage, and social media presence. Not surprisingly, each of the 21 Folios contained beautiful color prints of the artists' respective aerosol works of art which are the subject of the lawsuit. They are appended to this opinion. It is apparent that they reflect striking technical and artistic mastery and vision worthy of display in prominent museums if not on the walls of 5Pointz. The Folios also contain photos showing how almost all of these works of art were partially or wholly whitewashed by Wolkoff.

---

[6] The jury also found that of the 28 works of recognized stature that were destroyed, 20 had also been mutilated, modified, distorted or otherwise modified in a manner prejudicial to the artist's honor or reputation.

5Pointz was an egalitarian place. The artists came from many backgrounds. Some of the plaintiffs testified via Skype from international residences. Many who live in New York had immigrated from other countries to join the 5Pointz community. One artist flew from London to testify; another came of age in rural West Virginia. Some artists came from highly prestigious art schools; others were self-taught. Some were fixtures in elite, traditional art circles; others were simply dedicated to street and community art. The Court was impressed with the breadth of the artists' works and how many of the works spoke to the social issues of our times.

The principal testimony about the advent, evolution and demolition of 5Pointz came from plaintiff Jonathan Cohen, one of the world's most accomplished aerosol artists. Wolkoff had designated Cohen as 5Pointz's *de facto* curator, appointing him to run the site and pick the works he thought were of merit: "I gave him permission, plain, Jonathan, you are in charge, bring whoever you think is right to come and display their work on my building." Tr. at 2025:4-8.

In addition to the artists, three experts testified for the plaintiffs. Renee Vara, a certified art appraiser, former head fine art expert at Chubb Insurance and art professor at New York University, testified to the quality and recognized stature of the works; Elizabeth Littlejohn, an art appraiser certified through the Appraisers Association of America, testified to their appraisal value; and Harriet Irgang Alden, the chief paintings conservator at Art Care NYC, testified as to the removability of

14

each of the artworks from the 5 Pointz walls.

Plaintiffs also called two fact witnesses. Angelo Madrigale, Vice President and Director of Contemporary Art at Doyle New York, an auction house, wrote a letter upon which Vara relied in formulating her report. He testified to the artistic importance of the works. Lois Stavsky developed a 5Pointz exhibit for Google Arts and Culture and testified to the creation of that exhibit and why Google believed that 5Pointz was a culturally significant site.

Wolkoff was the defendants' principal witness. He testified to his rise from a poor childhood to become a successful real estate developer and explained his role in the advent and success of 5 Pointz. He was adamant that the artists knew that the day would come when the warehouse buildings bearing their works of art would come down and be replaced by high-rise residential condos.

Although the Court believes that Wolkoff in the main testified truthfully, he was a difficult witness. He frequently ignored or challenged instructions by the Court. He was argumentative and prone to tangents and non-responsive answers. Eliciting coherent testimony was a chore and was only achieved after the Court threatened to hold him in contempt. *See,* e.g., Tr. at 2033:18-2034:2; 2036:19-2037:24; 2045:23-2047:6; 2087:22-2088:13; 2092:13-22.

In addition to Wolkoff, two experts testified for the defendants. Erin Thompson, a professor of art history at the City University of New York and

15

practicing art lawyer, testified as to the issue of recognized stature, and Christopher

Gaillard, a fine art appraiser with the art appraisal and acquisition firm Gurr Johns,

testified as to the works' appraisal value.

The story of 5Pointz that follows comes primarily from the lips of Cohen and

Wolkoff.

**III**

**A. The Advent and Evolution of 5Pointz**

What became 5Pointz originated as Phun Phactory in the early 1990s. The

warehouses were largely dilapidated and the neighborhood was crime infested. There

was no control over the artists who painted on the walls of the buildings or the quality

of their work, which was largely viewed by the public as nothing more than graffiti.

This started to change in 2002 when Wolkoff put Cohen in charge. Cohen and several

other artists also rented studio space in the warehouse buildings. Collectively, they

worked to improve conditions. As Cohen explained:

> We took it upon ourselves to clean the loading dock. . . . The dumpsters
> were overflowing. We took it upon ourselves, we hired his employees,
> we paid for the lighting. We put motion sensors up so that when you
> came to the loading dock it was inviting. It actually drew you in as
> opposed to scaring you away.

*Id.* at 1448:20-1449:3.

Wolkoff recognized the merit of the art. As he acknowledged: "I liked it and

they did more and more and I thought it was terrific. They were expressing

16

themselves." *Id.* at 2082:4-5. And he approved of the job Cohen did in curating the art: "I have no feelings even today against Jonathan Cohen. I thought he was terrific handling my building. . . . Anything to do with art I left up to Jonathan. He had good taste in the artists that came there." *Id.* at 2086:13-17.

Until Wolkoff decided over a decade later that the economic climate was ripe to convert the site into luxury condos, he and Cohen had a copacetic relationship.

But nothing was ever reduced to writing and Wolkoff only verbally laid out three rules for what could be put on the walls: no pornography, no religious content, and nothing political. In his role, Cohen established a system of rules for both the creation and curation of the art, spending seven days a week without pay to bring 5Pointz to fruition.

Cohen oversaw the site, kept it clean and safe, allotted wall space, and explained the site's rules and norms to new artists. Over time, crime in the neighborhood dropped and the site became a major attraction drawing thousands of daily visitors, including busloads of tourists, school trips, and weddings. Movie, television, and music video producers came; it was used for the 2013 motion picture *Now You See Me*, starring Jesse Eisenberg and Mark Ruffalo, and was the site of a notable tour for R&B singer Usher.

As the plaintiff Castillo explained, "street art became a new form," which "now has become an industry." Tr. at 202:6, 202:10. And 5Pointz became "this outdoor

17

museum where kids can touch the wall, and . . you can't do that at a museum. You can't go and touch a Van Gogh or like a Mona Lisa." *Id.* at 202:2-5.

Wolkoff had nothing to do with day-to-day operations. Under Cohen's control, he witnessed his buildings emerge as a mecca for the world's largest collection of quality outdoor aerosol art.

## B. The Walls

## 1. Covering

5Pointz was a site of creative destruction; most artworks had short lifespans and were repeatedly painted over by successive artists. The rules behind covering were important; as virtually every artist testified, "going over" someone else's piece without permission was a sign of disrespect that could cause conflicts. Going over another piece partially or sloppily was another insult. As Cohen explained:

> [Y]ou respect your wall, you clean up when you're done, you cover what you go over completely. If you do not cover what you went over, you do not last. That was rule number one. Respect in our game is everything, and if you don't have respect then you don't get respect.

Tr. at 1443:15-22. As a result, Cohen established an elaborate system of rules and norms governing how long pieces would remain and when a piece could be covered by a new artwork. As he testified:

> THE COURT: Let me ask you a question. Can anybody paint over your paintings without your permission, aside from vandalism?
>
> A: No. Everything was done with permission and there was a system

18

that grew over the period of time I was there. You know, we perfect as
we go along.

*Id.* at 1423:18-23.

## 2. Short-Term Rotating Walls vs. Long-Standing Walls

5Pointz was organized into short-term rotating walls and long-standing walls.

The short-term walls would change on a daily or weekly basis. As Cohen explained:

"There were allocated spaces that were for straight beginners that had no idea how

to paint. And those, I would say you could utilize the space, but it more than likely

will be gone tomorrow or the next day or whatever." *Id.* at 1441:18-22. "Short-term

rotating walls, it was communicated up front so they'd know you could have several

weeks or whatever." *Id.* at 1444:13-15.

On the other hand, pieces on long-standing walls were more permanent,

although a high-quality piece could achieve permanence even if not initially placed

on a long-standing wall; but an artist's reputation was not sufficient to secure long-

standing status. As Cohen further explained:

> [T]he prime real estate that faces the train were the most sought after
> spots to paint and those went to more advanced writers. You've got to
> understand, as well, because you are an advanced writer doesn't mean
> that you are going to perform on an advanced level. You may just want
> to blow off steam one afternoon, but that doesn't mean your piece
> should last a long time. And you could be a beginner and do the
> performance of your lifetime and produce a piece that is so amazing that
> it's decided it will stay.

*Id.* at 1441:22-7.

19

While Cohen had the final say as to the duration of the pieces, he always spoke with the artists about their planned lifespan and eventual replacement. As he testified: "For long term productions, where people invested time and money, I would communicate with them. I would reach out to them. In some instances, I would tell them to come back and actually egg them on to do something real better. As the bar got raised, everybody performed better." *Id.* at 1444:14-19.

In other words, 5Pointz operated not just as a creative space, but a competitive place. Artists would compete to outdo one another and earn prominent placement on a long-standing wall. In addition to the walls facing the passing 7 train, which were seen by millions of commuters, the artists prized the walls near the loading docks, which had the most foot traffic, and the walls inside the buildings, which were generally long-standing. While as many as 10,000 works were destroyed while Cohen was in charge, it was not anarchy. Most of the best works by the best artists achieved permanent or semi-permanent placements on the long-standing walls.

## C. The Planned Demolition

Starting in 2011, rumors that Wolkoff had plans to shut down 5Pointz and turn it into luxury condos began to concern the artists. In May 2013, the rumors became reality: Cohen learned that Wolkoff had started to seek the requisite municipal approvals for his condos.

Hoping to save 5Pointz, Cohen filed an application with the City Landmark Preservation Commission to preserve the site as one of cultural significance. It was denied because the artistic work was of too recent origin. *See* Letter from NYC Landmarks Preservation Commission, August 20, 2013, ECF No. 31.

Cohen also sought funding to buy the property, which had been valued at $40 million. However, this fell through in October 2013 when Wolkoff obtained a necessary variance, instantly raising the property value to more than $200 million. The higher price was out of reach of Cohen's potential investors. Plaintiffs then initiated this litigation to enjoin Wolkoff from destroying 5Pointz.

**D. The Whitewashing**

As soon as the Court denied the plaintiffs' application for preliminary injunction, Wolkoff directed the whitewashing of virtually all the artwork on the 5Pointz site with rollers, spray machines, and buckets of white paint.[7]

The whitewashing was inconsistent. Some works were completely covered in white paint. Others were only partially covered. Some were fully covered, but by such a thin layer of paint that the artwork was easily visible beneath the paint. What was consistent was that none of the covered works was salvageable. And plaintiffs were no longer allowed on the site, even to recover the scattered remnants of their ruined

---

[7] Some other colors were sporadically used, including black and blue paint, but the vast majority of the whitewashing was done with white paint.

creations.

Since their works were effectively destroyed,[8] plaintiffs were relegated to seeking monetary relief under VARA.

## IV

### A. Temporary Works of Art

Defendants' overarching contention is that plaintiffs knew that the day would come when the buildings would be torn down and that, regardless, the nature of the work of an outdoor aerosol artist is ephemeral.[9] They argue, therefore, that VARA should not afford plaintiffs protection for their temporary works.[10]

––––––––––––––––

[8] The Court notes that one work, Richard Miller's *Monster II*, survived the whitewashing but was later destroyed by a backhoe. The plaintiffs did not have direct evidence of whitewashing for seven others because the works were inside a building to which they had no access after the whitewashing—Jonathan Cohen's *Character* and *Inside Wildstyle*, Luis Gomez's *Inside King Kong*, Richard Miller's *Monster I*, and Luis Lamboy's *World Traveler, Logo for Clothing Brand aka Monopoly Man*, and *Electric Fish*. However, several plaintiffs testified that they believed the inside works were destroyed in the whitewashing, and the Court credits the plaintiffs' testimony that they were not allowed onto the property to retrieve the works after the whitewash and were threatened with arrest if they tried.

[9] While Cohen acknowledged that he knew that Wolkoff intended to eventually tear down the buildings to make way for his new condos, other plaintiffs testified that they had no such knowledge. Regardless, even if the artists were allowed to waive their VARA rights orally (which they were not), none of the other artists ever spoke to Wolkoff. As he acknowledged at trial: "I didn't know any of the artists. I only dealt with Jonathan Cohen." Tr. at 2023:16-17.

[10] Defendants also assert the affirmative defense of "abandonment." It is meritless since it only affects ownership of the work's copyright. *See Capitol*

VARA does not directly address whether it protects temporary works. However, in the context of works on buildings, it is clear from 17 U.S.C. § 113(d) that temporary works are protected. Moreover, relevant case law conceptually supports this conclusion. In short, there is no legal support for the proposition that temporary works do not come within VARA's embrace.

First, § 113(d)(1) specifies that an unremovable work incorporated in a building is protected by VARA unless the artist waives his or her rights in a writing signed by both the artist and the building owner. If the building owner could orally inform the artist that the building is coming down someday, and thereby convert the work into an unprotected  temporary work, the written consent provision would be rendered nugatory. As the House Judiciary Committee Report explains: "The purpose of [the written waiver] is to ensure that the author is made fully aware of the circumstances surrounding the installation and potential removal of the work and has nevertheless knowingly subjected the work to possible modifications that would otherwise be actionable under section 106A." H.R. Rep. No. 101-514, at 21. And as

---

*Records, Inc. v. Naxos of America, Inc.,* 372 F.3d 471, 483 (2d Cir. 2004) (holding "abandonment of *copyright* requires "(1) an intent by the *copyright holder* to surrender rights in the work; and (2) an overt act evidencing that intent." (emphasis added)). Defendants have not pointed to any overt act showing an intent to abandon ownership. Quite the opposite: The moment the artists learned of defendants' intent to destroy their works, they began legal proceedings to save them. This was the antithesis of abandonment.

Patry adds: "In light of this provision's purpose of ensuring that artists be made aware fully of the circumstances surrounding installation and potential destructive removal, it should be strictly construed." *Patry* § 16:33.

Second, § 113(d)(2), specifying that artists are entitled to 90 days' written notice to allow them to salvage their removable works, contemplates that such works may be temporarily on the side of a building. Thus, VARA resolves the tension between the building owners' rights and the artists' rights through § 113(d), not by excluding temporary works from protection.

Of the limited available case law, *Board of Managers of Soho International Arts Condominium v. City of New York*, 2003 WL 21403333 (S.D.N.Y. June 17, 2003) perhaps best illustrates this point. There, an artist sought to prevent his work from being permanently removed from the wall of a condo under VARA. There was conflicting testimony as to whether the work was intended to be kept on the wall permanently or temporarily. Nonetheless, the Court, in denying summary judgment, held VARA only allowed the artist to remove the mural, not keep it in its place. The court rejected the artist's argument that removal was "tantamount to the Work's destruction" as "[n]owhere in the [dictionary] definition of 'remove' does the temporality of the act of removal arise." *Id.*, at *10. Therefore, it was "clear to the Court that what Congress intended in bifurcating § 113(d)'s protections was to separate removal situations based not on the temporality of the removal but on the

*consequences* of the removal." *Id.*[11]

Thus, VARA draws no distinction between temporary and nontemporary works on the side of a building, particularly when all that makes a work temporary is the building owner's expressed intention to remove or destroy it. VARA protects such works; how it protects them is governed by the carefully crafted provisions of § 113(d) based on the removability of the works, not their permanence.[12]

Also supporting the conclusion that VARA applies to temporary works is 17 U.S.C. § 106A(c)(1), which provides that modifications that are "the result of the passage of time or the inherent nature of the materials" are not violations of VARA. This exception was applied in *Flack v. Friends of Queen Catherine Inc.*, 139 F. Supp. 2d 526 (S.D.N.Y. 2001), where the court dismissed a VARA claim because the head of a statue was exposed to the elements, causing the clay to deteriorate, but there was no evidence that the defendant otherwise directly damaged the work. 139 F. Supp. 2d at 534-35. The exception is not applicable here. The whitewashing was not caused by the "passage of time" or the "inherent nature of the materials"; it was caused by

---

[11] A key difference between *Board of Managers* and this litigation is that the *Board of Managers* artwork was installed before VARA was enacted. This meant that the § 113(d)(1) written waiver provision did not apply in that case, and if a jury would find that the work was unremovable, VARA would not protect it. However, any unremovable work at 5Pointz would be protected by VARA because Wolkoff failed to obtain a written waiver.

[12] Damages under VARA could, of course, vary depending on whether the works were permanent or temporary.

Wolkoff throwing paint on the works.

Thus, Congress chose to exclude protection for the passage of time and natural deterioration but not for other types of temporary works. Under the principle of statutory interpretation *expressio unius est exclusio alterius* (the expression of one thing implies the exclusion of others), this choice lends support to the conclusion that there is no categorical exception for temporary works.

Moreover, the First Circuit has held that VARA protects unfinished works. *Mass. Museum of Contemporary Art Found., Inc. v. Buchel*, 593 F.3d 38, 65 (1st Cir. 2010). An unfinished work is inherently in a temporary state since the ultimate goal is always to finish the work; thus, VARA protects the interim, unfinished work even though it is only temporarily in that form.[13]

Analogy to traditional copyright law is also relevant. Under the Copyright Act —of which VARA is a part—a work is "'created' when it is fixed in a copy or phonorecord for the first time[.]" 17 U.S.C. § 101. And a work is "'fixed' in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is *sufficiently permanent or stable to permit it to be perceived . . . for a period of more than transitory duration.*" *Id.* (emphasis added).

_____

[13] Contrast *Pollara v. Seymour*, 344 F.3d 265 (2d Cir. 2003), which held that a poster created for a one-time event was not protected by VARA because it was advertising material, an express exception. Notably, the Court declined to adopt the district court's alternative reasoning, which would have held the work was not of recognized stature because it was made for a one-time event.

For copyright protection, therefore, fixation for even a short period will suffice.

Thus, in *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008)*,* the Second Circuit held that copies of television programs were not capable of being perceived "for a period of more than transitory duration" when they existed in the defendant's data buffers for only 1.2 seconds. 536 F.3d at 129. However, the court suggested that a work would exist for "more than transitory duration" if it was embodied in the data buffers for "at least several minutes." *Id.* at 128. With no indication to the contrary, it is reasonable to assume that Congress intended to apply the same minimal fixation requirement to works of visual art under VARA. *Cf. Buchel,* 593 F.3d at 51 (applying § 101's fixation requirement to conclude that unfinished works are protected under VARA).

In sum, § 113(d) contemplates temporary works, § 106A(c) excludes only a narrow category of temporary works unrelated to this case, and analogous case law is consistent with the conclusion that temporary works are protected under VARA.[14]

## B. Works of Recognized Stature

As the Court stated in *Cohen I*, the district court's decision in *Carter v. Helmsley-Spear, Inc.*, 861 F. Supp. 303 (S.D.N.Y. 1994) ("*Carter I*"), *aff'd in part, vacated in part, rev'd in part*, 71 F.3d 77 (2d Cir. 1995) ("*Carter II*") remains the

---

[14] Common sense also supports this conclusion. Who would argue, for example, that if Picasso had painted *Guernica* on the walls of 5Pointz with the building owner's consent it would not be worthy of VARA protection?

seminal case interpreting the phrase "recognized stature"—which is not defined in VARA—to require "a two-tiered showing: (1) that the visual art in question has 'stature,' *i.e.* is viewed as meritorious, and (2) that this stature is 'recognized' by art experts, other members of the artistic community, or by some cross-section of society." 861 F. Supp. at 325.

The Second Circuit on appeal never had occasion to address the correctness of this formulation since, in reversing, it held that the work did not qualify for VARA protection because it was made for hire. *Carter II,* 71 F.3d at 85-89. But one circuit court did thereafter embrace and apply the district court's standard for evaluating whether a work of visual art is of "recognized stature."

As explained in *Cohen I*, the Seventh Circuit in *Martin v. City of Indianapolis*, 192 F.3d 608, 612 (7th Cir. 1999), noted that the *Carter I* test "may be more rigorous than Congress intended," *id.* at 612, but nonetheless affirmed the district court's grant of summary judgment and its award of damages for a sculpture that had been destroyed, under the *Carter I* test utilized by the district court. In doing so, it noted that "plaintiff offered no evidence of experts or others by deposition, affidavit or interrogatories," but nonetheless established the work's recognized stature via "certain newspaper and magazine articles, and various letters, including a letter from an art gallery director and a letter to the editor of *The Indianapolis News*, all in support of the sculpture." *Id.*

28

The circuit court's decision in *Martin* appropriately recognizes, therefore, that expert testimony is not the *sine qua non* for establishing that a work of visual art is of recognized stature, and indeed the district court in *Carter I* cautioned that plaintiffs need "not inevitably . . . call expert witnesses to testify before the trier of fact." 861 F.Supp. at 325. This is in keeping with Congress's expansive recognition of the moral rights of attribution and integrity of the visual artist and the consequent need to create "a climate of artistic worth and honor that encourages the author in the arduous act of creation." *Carter II*, 71 F.3d at 83 (quoting H.R. Rep. No. 101-514, at 5). As the Second Circuit noted in *Carter II*, therefore, the courts "should use common sense and generally accepted standards of the artistic community in determining whether a particular work" is a work of visual art since "[a]rtists may work in a variety of media, and use any number of materials in creating their works." *Id.*

The same common sense should be utilized in assessing whether the visual work is of recognized stature since "[b]y setting the standard too high, courts risk the destruction of the unrecognized masterwork; by setting it too low, courts risk alienating those . . . whose legitimate property interests are curtailed." Christopher J. Robinson, *The "Recognized Stature" Standard in the Visual Artists Rights Act*, 68 Fordham L. Rev 1935, 1968 (2000). Thus, as one court has held, even inferred recognition from a successful career can be considered in determining whether a visual artist's work has achieved recognized stature. *See Lubner v. City of Los*

*Angeles*, 45 Cal. App. 4th 525, 531 (1996).

In the present case, the Court need not dwell on the nuances of the appropriate evidentiary standard since the plaintiffs adduced such a plethora of exhibits and credible testimony, including the testimony of a highly regarded expert, that even under the most restrictive of evidentiary standards almost all of the plaintiffs' works easily qualify as works of recognized stature.

To begin, that Jonathan Cohen selected the handful of works from the thousands at 5Pointz for permanence and prominence on long-standing walls is powerful, and arguably singular, testament to their recognized stature. They were walls that spanned multiple stories, walls visible to millions on the passing trains; walls near the entrances. Many of these works had survived for years. As 5Pointz's curator, Cohen considered them outstanding examples of the aerosol craft. And as Wolkoff himself acknowledged, Cohen was qualified to assess the artistic merits of the works since "he had good taste in the artists that came there." Tr. at 2086:17. They were 5Pointz's jewels.

Wolkoff's faith in Cohen was not unwarranted. The multitude of artists painting on the walls marched to Cohen's beat. He called the shots and had the respect of his artistic community. That it was he who chose the works that are worthy of VARA protection in this litigation speaks volumes to their recognized stature.

But there is so much more. All of the plaintiffs had also achieved artistic recognition outside of 5Pointz. And in their Folios they collectively presented over a thousand exhibits in support of their claims that their works at 5Pointz had achieved recognized stature. The Folios covered the highlights of their careers, as well as evidence of the placement of their works at 5Pointz in films, television, newspaper articles, blogs, and online videos, in addition to social media buzz.

And plaintiffs' highly qualified expert, Vara, provided detailed findings as to the skill and craftsmanship of each of the 49 works, the importance of 5Pointz as a mecca for aerosol art, the academic and professional interest of the art world in the works, and her professional opinion that they were all of recognized stature. The Court finds Vara highly credible and affords great weight to her testimony, although, as explained *infra*, it finds that four of the 49 works do not qualify as having achieved recognized stature.

Defendants' expert Thompson's testimony had two fatal flaws: First, she used an unduly restrictive interpretation of recognized stature that was more akin to a masterpiece standard. Second, she relied heavily on her inability to find the works on social media or in academic databases; but, as effectively drawn out by plaintiffs' counsel on cross-examination, her search methodology was unduly restrictive and almost designed to avoid finding results. Tellingly, her searches did not even uncover many of plaintiffs' social media exhibits, demonstrating the weakness of her

approach. Her final conclusion that none of the works had achieved recognized stature defies credibility. If not a single one of these works meet the recognized stature standard, it is hard to imagine works that would, short of a Caravaggio or Rembrandt.

## 1. Recognized Stature of Individual Artworks

The Court now turns to making the requisite individualized findings as to each of the 49 works:

### a. The Long-Standing Works

The Court finds that 37 works on long-standing walls all achieved recognized stature by virtue of their selection by Cohen for these highly coveted spaces, as reinforced by the supportive evidence in the plaintiffs' Folios and Vara's compelling expert testimony as to their artistic merit and embrace by the artistic community. They are:

• Jonathan Cohen's *Eleanor RIP*, *7-Angle Time Lapse, Patience, Character, Clown with Bulbs, Meres Outdoor Wildstyle*, and *Inside Wildstyle*

• Sandra Fabara's *Green Mother Earth*

• Luis Lamboy's *Blue Jay Wall*, *Inside 4th Floor*, *World Traveler*, *Logo for Clothing Brand aka Monopoly Man*, and *Electric Fish*

• Esteban Del Valle's *Beauty and the Beast*

• Christian Cortes's *Skulls Cluster*, *Jackson Avenue Skulls*, *Up High Blue Skulls*, and *Up High Orange Skulls*

- Carlos Game's *Geisha*, *Marilyn*, *Red*, *Denim Girl*, and *Black and White 5Pointz Girl*

- James Rocco's *Bull Face*, *Lord Paz*, and *Face on Jackson*

- Steven Lew's *Crazy Monsters*

- Nicholai Khan's *Dos Equis Man*

- James Cochran's *Subway Rider*

- Luis Gomez's *Inside King Kong*

- Richard Miller's *Monster I*

- Jonathan Cohen and Maria Castillo's *Love Girl and Burner*

- Jonathan Cohen and Akiko Miyakami's *Underwater Fantasy*

- William Tramontozzi, Jr. and James Rocco's *Jimi Hendrix Tribute*

- Akiko Miyakami and Carlos Game's *Japanese Fantasy*

- Bienbenido Guerra and Carlo Nieva's *Return of New York*

- Jonathan Cohen, Luis Lamboy, and Thomas Lucero's *Angry Orchard*

**b.  Other Works**

Ten works on the walls were of recent origin; two were not on walls at all.  For these 12 works, the Court "adopt[s] in whole" the jurors' findings. *Ragin,* 6 F.3d at 907. As representatives of the community and a "cross-section of society," *Carter*, 861 F.Supp. at 325, their input as an advisory jury was of value to the Court, "particularly . . .in cases [such as this one] involving community-based standards."

*NAACP v. Acusport Corp.*, 226 F. Supp. 2d at 398.

The jury found recognized stature for Rodrigo Henter de Rezende's *Fighting Tree*, Thomas Lucero's *Black Creature*, Akiko Miyakami's *Manga Koi*, Francisco Fernandez's *Dream of Oil*, Nicholai Khan's *Orange Clockwork*, Kenji Takabayashi's *Starry Night*, Richard Miller's *Monster II*, and Jonathan Cohen and Akiko Miyakami's *Save 5Pointz*. These eight works garnered third party attention, social media presence, and/or promises from Cohen that they would be long-standing.

The jury did not find recognized stature for Jonathan Cohen's *Drunken Bulbs*, Akiko Miyakami's *Japanese Irish Girl*, Carlos Game's *Faces on Hut*, and Jonathan Cohen and Rodrigo Henter de Rezende's *Halloween Pumpkins*.

*Drunken Bulbs* and *Japanese Irish Girl* were gifts to the Shannon Pot Bar.[15] They were not part of the curated 5Pointz collection. Furthermore, neither attracted significant third-party attention or social media buzz during their short life spans.

*Faces on Hut* was not on a 5Pointz wall; it was on a tin shack near the loading dock. As its creator, Carlos Game testified: "[N]obody wanted to paint on it because it was a tin shack, you know, and it was rusted out . . . ." Tr. at 794:12-13. Game also did not adduce any social media coverage or commentary regarding the work.

*Halloween Pumpkins* was created in very late October 2013, less than a month

---

[15] Though unclear from the testimony of Miyakami and Cohen, this bar appears to have been on the 5Pointz site.

before the whitewash, and did not achieve any third party recognition. Moreover, because it was Halloween-themed, it was unlikely to have survived the holiday season.

In sum, the Court finds 45 of the 49 works achieved recognized stature. *Drunken Bulbs*, *Japanese Irish Girl*, *Faces on Hut*, and *Halloween Pumpkins* did not.

## C. Mutilation and Prejudice to Honor or Reputation

As noted, even if a work is not of "recognized stature," VARA also protects works from "intentional distortion, mutilation, or other modification . . . [that] would be prejudicial to [the artist's] honor or reputation." 17 U.S.C. § 106A(a)(3)(A). "[I]n determining whether 'intentional distortion, mutilation, or modification' of [a] Work would be 'prejudicial to [plaintiffs'] honor or reputation,' [a court should] consider whether such alteration would cause injury or damage to plaintiffs' good name, public esteem, or reputation in the artistic community." *Carter I*, 861 F. Supp. at 323.

This concept is inherently murky. *Carter I* held that an artist's honor or reputation may be harmed if the artwork "present[ed] to viewers an artistic vision materially different from that intended by [the artist]." *Id.* In *Massachusetts Museum of Contemporary Art Foundation, Inc. v. Buchel*, 593 F.3d 38 (1st Cir. 2010), the circuit court held that changes made to an unfinished art installation by a museum against the artist's wishes were sufficient to raise a question of fact as to whether the artist's honor or reputation were injured. The court focused on evidence that

newspapers covering the exhibit after the changes had a negative opinion of the altered work.

Here, the question is academic in respect to the 45 works of recognized stature since the Court is not awarding any actual damages, as explained *infra*, and only one statutory damages award may be awarded per artwork "for all infringements involved in the action." 17 U.S.C. § 504(c)(1). Thus, whether defendants are additionally liable under this second prong is not of any practical consequence.

Of the remaining four, *Japanese Irish Girl* was destroyed and therefore not "distorted, mutilated, or otherwise modified." *Faces on Hut* was not destroyed until the demolition of the building and apparently survived the whitewash. Therefore, it too was not "distorted, mutilated, or otherwise modified."

*Drunken Bulbs* was only partially whitewashed; the outlines of the bulbs are dimly visible underneath the white paint. However, these vague outlines are unrecognizable as Cohen's original work. Nobody looking at the work would know that it was his. Therefore, the Court holds this distortion did not prejudice his honor or reputation.

*Halloween Pumpkins* was almost entirely covered in black paint, but Cohen's "wild style" contribution to the painting was apparently left untouched. However, Cohen testified that he was able to recover this portion of the work, and once the piece was removed, the final result was a black wall; the original artwork was not

36

visible at all under the black paint, except for one purple cloud at the top of the wall, a minor detail in the painting. Therefore, the Court holds this distortion also did not prejudice the artists' honor or reputation.

Having determined that the defendants have violated plaintiffs' rights by intentionally destroying their works of "recognized stature," the Court now turns to damages.

## V

### A. Actual Damages

As for actual damages,[16] the parties presented dueling experts as to the valuation of the destroyed works. Plaintiffs' expert, Elizabeth Littlejohn, testified that the works were worth from $50,000 to $80,000 per artwork. She arrived at this number through a complicated formula that began with the sale price of a Banksy[17] piece and awarded each artwork a percentage of that value based on the artist's

---

[16] In addition to actual damages, 17 U.S.C. § 504(a)(1) awards "any additional profits of the infringer" to the winning plaintiff. However, while the plaintiffs established that Wolkoff profited indirectly from the destruction of their artwork by building a profitable luxury condominium, they provided no evidence to establish the precise amount of these profits. Nor have plaintiffs suggested a fair way to apportion the luxury condominium's profits between those caused by the legal development of the site as a business venture and the illegal destruction of the artwork to clear the site for construction. Therefore, the Court finds the plaintiffs have not met their burden to establish a basis to award profits. The gain realized by Wolkoff and his companies is best addressed in calculating an award under the statutory damages factors, *see infra*.

[17] Banksy is widely considered the world's most prominent aerosol artist.

reputation, the merit of the work, and other factors.

The Court finds this methodology flawed. First, it does not account for the removal costs of the works, which plaintiffs' own removal expert, Alden, testified could run in the hundreds of thousands of dollars. Second, there is no evidence that these artists have ever achieved a fraction of Banksy's sales history; most testified that they had never sold a work for more than a few thousand dollars. Third, Littlejohn's method did not account for the unique problems in selling artwork that is the size of a wall of a building.

The Court finds defendants' appraisal expert, Christopher Gaillard, credible. Gaillard testified that because of the unique challenges and costs of selling those artworks at 5Pointz which were the size of a building wall, they did not have a provable market value. The Court agrees and holds that plaintiffs failed to establish a reliable market value for their works.

Therefore, the Court does not award actual damages.[18]

---

[18] Plaintiffs contend that they are entitled to damages for emotional distress. Under traditional copyright law, plaintiffs cannot recover such damages. *See Garcia v. Google, Inc.*, 786 F.3d 733, 745 (9th Cir. 2015) ("[A]uthors cannot seek emotional damages under the Copyright Act, because such damages are unrelated to the value and marketability of their works."); *Kelley v. Universal Music Group*, 2016 WL 5720766, at *2 (S.D.N.Y. Sept. 29, 2016) ("Because emotional distress damages are not compensable under the Copyright Act, this claim must also be dismissed."). Since VARA provides damages under "the same standards that the courts presently use" under traditional copyright law, H.R. Rep. No. 101-514, at 21-22 (1990), emotional damages are not recoverable.

**B. Statutory Damages**

The Copyright Act affords the trial court "wide discretion . . . in setting the amount of statutory damages." *Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc.*, 807 F.2d 1110, 1116 (2d Cir. 1986). Statutory damages are "not fixed or readily calculable from a fixed formula." *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 352-53 (1998) (citation omitted). "Even for uninjurious and unprofitable invasions of copyright the court may, if it deems it just, impose a liability within statutory limits to sanction and vindicate the statutory policy." *F.W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228, 233 (1952). There need not be a correlation between statutory damages and actual damages. *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 127 (2d Cir. 2014). "To suggest otherwise is to ignore the various other factors a court may consider and the purposes of statutory damages in the willful infringement context." *Id.* "Statutory damages exist in part because of the difficulties in proving—and providing compensation for—actual harm in copyright infringement actions." *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 302 F. Supp. 2d 455, 460 (D. Md. 2004).

As such, statutory damages are particularly appropriate "when no actual damages are proven or they are difficult to calculate." *Warner Bros. Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1126 (2d Cir. 1989). They are "not meant to be merely compensatory or restitutionary. The statutory award is also meant 'to discourage

wrongful conduct.'" *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 113 (2d Cir. 2001) (rejecting defendant's argument that statutory damages award should be overturned because it "bears little relationship" to actual damages) (citation omitted).

As previously explained, the factfinder may award between $750 and $30,000 per work, unless the infringement was committed willfully; if so, the award may be as high as $150,000 per work. Review of a statutory damages award made after a finding of willfulness "is even more deferential than abuse of discretion." *Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co., Inc.*, 74 F.3d 488, 496 (4th Cir. 1996) (citing *Douglas v. Cunningham*, 294 U.S. 207, 210 (1935)). "Within [the statutory] limitations the court's discretion and sense of justice are controlling . . . ." *D.C. Comics Inc. v. Mini Gift Shop*, 912 F.2d 29, 34 (2d Cir. 1990) (quoting *L.A. Westermann v. Dispatch Printing Co.*, 249 U.S. 100, 106 (1919)).

## 1. Willfulness

"A copyright holder seeking to prove that a copier's infringement was willful must show that the infringer 'had knowledge that its conduct represented infringement or . . . recklessly disregarded the possibility.'" *Bryant v. Media Right Prods.*, 603 F.3d 135, 143 (2d Cir. 2010) (quoting *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1382 (2d Cir. 1993)). "This knowledge may be 'actual or constructive.'" *N.A.S. Import, Corp. v. Chenson Enters., Inc.*, 968 F.2d 250, 252 (2d Cir. 1992). "In other words, it need not be proven directly but may be inferred from

the defendant's conduct." *Id.*

The jury found that in each case Wolkoff acted willfully. The Court could not agree more. Wolkoff knew from the moment the lawsuit was initiated that the artists were pressing their VARA claims. He admitted as much at trial:

> Q: And you were aware that the artists were trying to apply under the Visual Artists Rights Act?
>
> A: Yes.
>
> . . .
>
> THE COURT: You heard about VARA at that time?
>
> A: Yes.
>
> THE COURT: You have a generalized view—
>
> A: At that time, yes.
>
> . . .
>
> Q: And you had hired Mr. Ebert's law firm at the time; correct?
>
> A: Yes.
>
> Q: You had a general counsel—an in-house lawyer advising you on legal matters; correct?
>
> A: Yes.

Tr. at 2016:24-2017:22.

As previously explained, under VARA, Wolkoff could have given the plaintiffs 90 days' notice to allow them the opportunity to salvage their works. And indeed,

plaintiffs' expert conservator, Alden, convincingly testified that curation techniques had evolved to the point where removal of works of art from the wall of a building was feasible and had been done. As an example, she referenced the Berlin Wall, from which hundreds of works of graffiti on the wall have been preserved and sold, auctioned, or given as gifts, including five works which were successfully transported to New York City. Alden also testified that she had personally successfully removed a mural from a building.

And in respect to the plaintiffs' works at 5Pointz, Alden explained that many could have been totally or partially removed by the artists, at little cost, because the works were on "siding or plywood or sheetrock" or they "incorporated doors or windows from the building [which] could have been easily removed," Tr. at 1971:23-1972:4; and many others could be removed by a conservator and contractors. *See* Exhibit 1270 (identifying 12 "Works for Which Artists' Removal Was Possible"; 9 "Works Which Artists Were Able to Partially Remove," and 28 "Works Which Could Only Have Been Removed by Conservator and Contractors").[19]

---

[19] It would logically seem that if Wolkoff did give the 90 days' notice and none of the works were removed by the artists, he would have the burden of proving which works were removable in order to avoid liability for their destruction. If that were to have happened, Alden would have been a good witness for him. However, since the notice was not given, Wolkoff was liable under VARA for the destruction of all the works of recognized stature.

But Wolkoff could care less. As he callously testified:

I decided—I alone decided to hire people to whitewash[] it in one shot instead of *waiting for three months* and them going to do something irrational again and getting arrested. I will go and end it and whitewash it. I decided to do that. It was pretty much a spur-of-the-moment thing.

Tr. at 2059:1-6 (emphasis added).

Wolkoff's reference to the artists doing "something irrational again and getting arrested" is fanciful and unfounded. Plainly, the evidence does not support the notion that he cared much for what was best for the artists. After the whitewash, he refused to let them onto his property to recover what had survived and even attempted to have them arrested when they tried to do so.

And his claim that he was worried that the plaintiffs may do something reckless and illegal is also belied by the evidence. The plaintiffs operated within the law in attempting to protect their works: They sought legal advice, filed a claim with the Landmark Preservation Commission, sought to generate public pressure to preserve the site, raised money, and filed this lawsuit. Wolkoff's only justification for his concern that the plaintiffs may attempt to break the law to preserve their work is that he heard nonspecific "rumblings." *Id.* at 2042:5. But he could not identify any particular source of the rumblings, nor had he ever personally had a problem with the artists:

Q: So this information that you received that the artists could be emotional is from someone you cannot identify; correct?

43

A: Yes.

Q: The artists were never violent; correct?

A: Correct.

Q: They always followed the law when then were on your property; correct?

A: Yes.

Q: You have never had any problems with the artists; right?

A: Absolutely correct.

Tr. at 2047:13-23.

As Cohen confirmed: "I followed the rules from day one. I went by my lawyer and he did not." *Id.* at 1464:2-3.

Wolkoff's recalcitrant behavior was consistent with the manner by which he testified in court. He was bent on doing it his way, and just as he ignored the artists' rights he also ignored the many efforts the Court painstakingly made to try to have him  responsively answer the questions posed to him.

From his testimony, the only logical inference that the Court could draw from Wolkoff's precipitous conduct as soon as the Court denied the artists' preliminary injunction application was that it was an act of pure pique and revenge for the nerve of the plaintiffs to sue to attempt to prevent the destruction of their art. This was the

epitome of willfulness.[20]

It remains for the Court to fix the amount of statutory damages.

## 2. The Statutory Factors

"When determining the amount of statutory damages to award for copyright infringement, courts consider: (1) the infringer's state of mind; (2) the expenses saved, and profits earned, by the infringer; (3) the revenue lost by the copyright holder; (4) the deterrent effect on the infringer and third parties; (5) the infringer's cooperation in providing evidence concerning the value of the infringing material; and (6) the conduct and attitude of the parties." *Bryant*, 603 F.3d at 144.[21]

Wolkoff rings the bell on each relevant factor.

---

[20] It may also well be that Wolkoff wanted to strike "while the iron was hot" and was willing to run the risk of being held liable for substantial statutory damages rather than to jeopardize his multimillion dollar luxury condo project. Indeed, with a fully developed record, permanent injunctive relief might have been available under the literal reading of VARA. Such behavior would be equally willful.

[21] The fifth factor does not fit this case. It is designed for traditional copyright cases where a defendant is liable for selling infringing material and the plaintiff's damages proof requires evidence of defendant's sales that can only be provided by defendant. *See Curet-Velazquez v. ACEMLA de Puerto Rico, Inc.*, 656 F.3d 47, 59 (1st Cir. 2011) (upholding maximum statutory damages award because defendants "did not provide comprehensive and accurate [accounting] reports" showing how they profited by selling plaintiff's work). Here, defendants destroyed, rather than sold, plaintiffs' works, so this factor is inapplicable, and the Court will not consider it.

## a. The Infringer's State of Mind

Because Wolkoff acted willfully in destroying the works of art, this factor weighs in favor of a high statutory damages award. As noted, Wolkoff's two alleged justifications for the whitewash—that it would be better for the plaintiffs to lose their works quickly, and that he was concerned the plaintiffs might do something reckless and illegal in an attempt to save the works—are implausible.

The whitewash did not end the conflict in one go; the effects lingered for almost a year. The sloppy, half-hearted nature of the whitewashing left the works easily visible under thin layers of cheap, white paint, reminding the plaintiffs on a daily basis what had happened. The mutilated works were visible by millions of people on the passing 7 train. One plaintiff, Miyakami, said that upon seeing her characters mutilated in that manner, it "felt like [she] was raped." Tr. at 1306:24-25. It is simply untenable that a rational person could view the whitewashing as being in the best interest of the artists.

## b. The Expenses Saved, and Profits Earned, by the Infringer

This factor is not a clean fit for VARA since, unlike a traditional copyright infringement case, Wolkoff did not sell the plaintiffs' art; hence, there were no direct profits. However, he indirectly profited when the value of the site increased from $40 million to $200 million as soon as the variance was obtained. Destroying 5Pointz

allowed Wolkoff to realize this gain. He also charged licensing fees to film at the site that netted him hundreds of thousands of dollars. Because Wolkoff realized significant profits by violating VARA, this factor cuts in favor of a high statutory damages award.

### c. Revenue Lost by the Copyright Holder

While the plaintiffs were never able to place a dollar figure on how the whitewash of 5Pointz impacted their careers, it often had a negative effect. As plaintiff Takabayashi testified: "I would actually have clients . . . come by and observe the work to get an idea of what they would be getting if I was going to execute a mural on their property . . . . There were possibilities—there was business that I probably lost because of the fact that the artwork was eliminated." Tr. at 315:23-316:4. And plaintiff Del Valle testified: "It definitely took away a lot of opportunities that I would have had. I was consistently getting contacted about opportunities . . . all coming from me building my career from [5Pointz]." *Id.* at 131:15-22.

Furthermore, as Cohen testified, the salvageable artwork at 5Pointz "could have adorned a museum, a full wing of a museum. . . . I don't think you guys really get a full idea of the picture of this building and its property . . . . It was eight stories tall. We could have filled a wing, if not more, of a museum." *Id.* at 1466:18-23.

The value of 5Pointz to the artists' careers was significant, and its loss, though difficult to quantify, precluded future opportunities and acclaim. Therefore, this factor also supports a significant statutory damages award.

### d. The Deterrent Effect on the Infringer and Third Parties

This is perhaps the most important factor in this case. Without a significant statutory damages award, the preservative goals of VARA cannot be met. If potential infringers believe that they can violate VARA at will and escape liability because plaintiffs are not able to provide a reliable financial valuation for their works, VARA will have no teeth. It will simply be cost-effective for infringers to violate the statute. This would not further its preservative goals.

Wolkoff has been singularly unrepentant. He was given multiple opportunities to admit the whitewashing was a mistake, show remorse, or suggest he would do things differently if he had another chance. He denied them all:

Q: Let me ask you a hypothetical question. Let's go back in time.

A: Yes.

Q: Would you have done it again?

A: Yes.

Tr. 2052:25-2053:4.

A: But that was the decision I made. I would make the same decision today if that happened today.

48

*Id.* at 2056:2-3.

Thus, Wolkoff remains undeterred, and unrepentant that his thoughtless act violated the law and had a devastating impact on people he claims he was trying to help. This factor could not cut more strongly in favor of a high statutory damages award.

**e. The Conduct and Attitude of the Parties**

The Court has discussed at length the problematic conduct of Wolkoff during the whitewashing and on the witness stand. Needless to say, he has not helped his case. On the other hand, the plaintiffs have conducted themselves with dignity, maturity, respect, and at all times within the law. Therefore, this factor also cuts heavily in favor of a high statutory damages award.

**3. The Statutory Damages Award**

Collectively, all five relevant factors support the maximum award of statutory damages. Therefore, the Court awards $150,000 for each of the 45 works, for a total statutory damages award of $6,750,000.

If not for Wolkoff's insolence, these damages would not have been assessed. If he did not destroy 5Pointz until he received his permits and demolished it 10 months later, the Court would not have found that he had acted willfully. Given the degree of difficulty in proving actual damages, a modest amount of statutory damages

49

would probably have been more in order.[22]

The shame of it all is that since 5Pointz was a prominent tourist attraction the public would undoubtedly have thronged to say its goodbyes during those 10 months and gaze at the formidable works of aerosol art for the last time. It would have been a wonderful tribute for the artists that they richly deserved.

## CONCLUSION

Judgment will be entered for each individual plaintiff in the following amounts:[23]

| Artist | Total Award |
| --- | --- |
| Jonathan Cohen | $1,325,000.00 |
| Sandra Fabara | $150,000.00 |
| Luis Lamboy | $800,000.00 |
| Estaban Del Valle | $150,000.00 |
| Rodrigo Henter de Rezende | $150,000.00 |
| Thomas Lucero | $200,000.00 |

---

[22] Of course, all this could have been easily avoided with a written waiver of the artists' VARA rights up front, as § 113(d) expressly contemplates.

[23] While § 504(c)(1) requires the plaintiffs to elect statutory damages in lieu of actual damages "before final judgment is rendered," the Court will deem that the plaintiffs have chosen to accept these statutory damages rather than no damages at all.

| | |
|---|---|
| Akiko Miyakami | $375,000.00 |
| Christian Cortes | $600,000.00 |
| Carlos Game | $825,000.00 |
| James Rocco | $525,000.00 |
| Steven Lew | $150,000.00 |
| Francisco Fernandez | $150,000.00 |
| Nicholai Khan | $300,000.00 |
| James Cochran | $150,000.00 |
| Luis Gomez | $150,000.00 |
| Richard Miller | $300,000.00 |
| Kenji Takabayashi | $150,000.00 |
| Maria Castillo | $75,000.00 |
| William Tramontozzi | $75,000.00 |
| Carlo Nieva | $75,000.00 |
| Bienbenido Guerra | $75,000.00 |
| Total | $6,750,000.00 |

**SO ORDERED**

/S/ Frederic Block
_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
February 12, 2018

# APPENDIX



Akiko Miyakami - *Japanese Irish Girl*

A-1



Akiko Miyakami - *Manga Koi*



Akiko Miyakami and Carlos Game - *Japanese Fantasy*

A-3



Akiko Miyakami and Jonathan Cohen - *Save 5Pointz*

A-4



Akiko Miyakami and Jonathan Cohen - *Underwater Fantasy*



Bienbenido Guerra and Carlo Nieva - *Return of New York*



Carlos Game - *Black and White 5Pointz Girl*



Carlos Game - *Denim Girl*

A-8



Carlos Game - *Faces on Hut*

A-9



Carlos Game - *Geisha*



Carlos Game - *Marilyn*

A-11



Carlos Game - *Red*

A-12



Christian Cortes - *Jackson Avenue Skulls*

A-13



Christian Cortes - *Skulls Cluster*



Christian Cortes - *Up High Orange Skulls*

A-15



Christian Cortes - *Up High Skulls*



Esteban Del Valle - *Beauty and the Beast*



Francisco Fernandez - *Dream of Oil*



James Cochran - *Subway Rider*

A-19



James Rocco - *Bull Face*

A-20



James Rocco - *Face on Jackson*

A-21



James Rocco - *Lord Paz*



Jonathan Cohen - *7-Angle Illusion*

A-23



Jonathan Cohen - *Character*

A-24



Jonathan Cohen - *Clown with Bulbs*



Jonathan Cohen - *Drunken Bulbs*

A-26



Jonathan Cohen - *Eleanor RIP*



Jonathan Cohen - *Inside Wildstyle*

A-28



Jonathan Cohen - *Outdoor Wildstyle*



Jonathan Cohen - *Patience*



Jonathan Cohen and Maria Castillo - *Burner and Love Girl*



Jonathan Cohen and Rodrigo Henter de Rezende - *Halloween Pumpkins*



Jonathan Cohen, Luis Lamboy, and Thomas Lucero - *Angry Orchard*



Kenji Takabayashi - *Starry Night*



Luis Gomez - *Inside King Kong*

A-35



Luis Lamboy - *Blue Jay Wall*

A-36



Luis Lamboy - *Electric Fish*

A-37



Luis Lamboy - *Inside 4th Floor*

A-38



Luis Lamboy - *Clothing Brand aka Monopoly Man*

A-39



Luis Lamboy - *World Traveler*

A-40



Nicholai Khan - *Dos Equis Man*

A-41



Nicholai Khan - *Orange Clockwork*



Richard Miller - *Monsters I*



Richard Miller - *Monsters II*



Rodrigo Henter de Rezende - *Fighting Tree*



Sandra Fabara - *Green Mother Earth*



Steven Lew - *Crazy Monsters*



Thomas Lucero - *Black Creature*

A-48



William Tramontozzi and James Rocco - *Jimi Hendrix Tribute*